# STATE OF CONNECTICUT *v.* EDDY ORELLANA
## (AC 24480)

Flynn, Bishop and Harper, Js.

Argued February 8—officially released May 17, 2005

*James B. Streeto*, assistant public defender, for the appellant (defendant).

*Toni M. Smith-Rosario*, senior assistant state's attorney, with whom, on the brief, were *Scott J. Murphy*, state's attorney, and *Paul N. Rotiroti*, assistant state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Eddy Orellana, appeals from the judgment of conviction, rendered after a jury trial, of possession of narcotics with the intent to sell by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b), conspiracy to sell narcotics by a person who is not drug-dependent in violation of General Statutes §§ 53a-48 and 21a-278 (b), and possession of narcotics with intent to sell within 1500 feet of a public housing project in violation of General Statutes § 21a-278a (b).[1] The defendant claims that (1) the trial court improperly denied his motion to suppress, (2) the court improperly permitted the state to present evidence that he had engaged in prior drug sales, (3) the court improperly permitted the state to present prior consistent statements of an informant as substantive evidence and (4) prosecutorial misconduct deprived the defendant of a fair trial. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. Prior to April 15, 2002, Jessica Jusino had assisted Christopher Chute, a detective in the narcotics enforce-

---

[1] The court sentenced the defendant to a total effective term of thirteen years imprisonment.

ment bureau of the New Britain police department, as a confidential informant in narcotics arrests. At approximately noon on April 15, 2002, Jusino contacted Chute and offered to arrange to have heroin delivered to a specific location in New Britain. Chute met with Jusino at approximately 4:30 that afternoon. By means of her cellular telephone, Jusino subsequently contacted the defendant and arranged for him to deliver 350 packets of heroin to her. The defendant had sold heroin to Jusino, in a similar manner, on prior occasions.

Jusino informed Chute that two Hispanic men, traveling in an older model, gold colored, four door Nissan, would deliver the heroin between 5:15 and 5:30 that evening to either the corner of Park and Stanley Streets or to a gasoline station at the intersection of East Main and Stanley Streets. Chute and other law enforcement personnel proceeded to those areas and began conducting surveillance. From his vantage point near the intersection of Park and Stanley Streets, Chute observed a Nissan, matching the description provided to him by Jusino, pass by between 5:15 and 5:30. The automobile was occupied by two Hispanic men. Upon seeing the automobile, Jusino, who was accompanying Chute, identified it as the vehicle carrying the heroin. For a short while, Chute followed the automobile in an unmarked police automobile. Chute described the automobile to his fellow officers, who were waiting nearby, and notified them of the automobile's location. Police officers stopped the automobile after it made a U-turn and approached the gasoline station at the intersection of East Main and Stanley Streets, one of the alternate locations described by Jusino. The automobile was less than 1500 feet from a public housing project.

When police officers approached the automobile, they discovered the defendant in the driver's seat and Pablo Perez in the passenger seat. Raymond Grzegorzek, an officer with the New Britain police department,

observed Perez leaning over as if to hide something in the automobile. Police later had to remove Perez forcibly from the automobile. The defendant was in possession of $1241 in cash. A white shopping bag, partially hidden under the passenger's seat of the vehicle, was found to contain 350 packets of heroin. The heroin had a street value of approximately $3500. The packets of heroin were separated into groups of ten, secured together with elastic bands. It was reasonable for the jury to infer, on the basis of those facts and other evidence presented at trial, that the defendant, who was not drug-dependent, possessed the heroin with the intent to sell it to Jusino within 1500 feet of a public housing project. Additional facts will be set forth as necessary in the context of the claims raised by the defendant.

I

The defendant first claims that the court improperly denied his motion to suppress. We disagree.

Prior to trial, the defendant filed a motion to suppress, "as the fruits of unlawful searches and seizures," all physical evidence seized from the automobile he was driving just prior to his arrest.[2] That physical evidence consisted of the 350 packets of heroin that police found in the automobile. The court conducted an evidentiary hearing related to the motion, with testimony from Chute, Grzegorzek and the defendant. The defendant argued that the police officers lacked either a reason-

[2] In his motion to suppress, the defendant argued that the police conduct violated rights afforded him under the fourth and fourteenth amendments to the United States constitution as well as article first, § 7, of the constitution of Connecticut. The court limited its analysis to the federal constitution. On appeal, the defendant bases his claim solely on the rights afforded him under the federal constitution and has not provided an independent analysis of the claim under the Connecticut constitution. Accordingly, we limit our consideration to those rights afforded by the federal constitution. See *State* v. *DeJesus*, 270 Conn. 826, 834 n.14, 856 A.2d 345 (2004).

able and articulable suspicion to stop his automobile or probable cause to search his automobile and that under the exclusionary rule, the court should suppress any evidence seized from the automobile as the fruits of police illegality. The court later denied the defendant's motion and issued a written articulation setting forth its factual findings and the legal basis for its ruling. At trial, the state presented evidence of the heroin seized from the defendant's automobile.

In its articulation stating the legal basis for denying the motion to suppress, the court found the following facts: "On the afternoon of April 15, 2002, Officer Christopher Chute, a six year veteran of the New Britain police department and member of the department's narcotics enforcement bureau, was contacted by one of his confidential informants who told him that she could purchase a large amount of heroin from individuals from the Bristol, Connecticut, area. Officer Chute knew the informant for a long time, and they had a history of working together on narcotics cases. On a prior occasion, the informant gave Chute information which led to the seizure of fifty packets of heroin and the arrest of two individuals. In the past, the informant also gave Chute information which led to the seizure of three kilograms of heroin. Additionally, other officers of the New Britain police department used the informant in the past, and the information she provided was reliable and led to positive results each time.

"Because both Chute and the informant at that time were occupied by other matters, they agreed to meet later in the day in order to arrange a controlled delivery of drugs. When they met at approximately 4:45 p.m., the informant told Chute that she could arrange the purchase of three and one-half stacks of heroin (the equivalent of 350 packets), from an individual from the Bristol area. While in Chute's presence, the informant had several telephone conversations in order to make

the arrangements for the delivery of narcotics. The informant told Chute that at approximately 5:15 p.m., two Hispanic males from the Bristol area, driving an older model gold, four door Nissan automobile, would deliver 350 packets of heroin to one of two specific locations in New Britain. The first or primary location for the delivery would be Park Street, near the intersection of Stanley Street. The second location was to be at a Citgo gasoline station on the corner of East Main Street and Stanley Street. The informant told Chute that she picked these locations because she had used them before when she dealt with these drug dealers. The two locations were about four blocks apart or one-quarter of a mile from each other. It would take about thirty seconds to get from one location to the other.

"After the arrangements were made, Chute and the informant drove to the primary location where the two Hispanic males were to deliver the heroin and positioned themselves on Park Street, west of Stanley Street, where they could see the intersection of Stanley Street and Park Street. Other narcotics enforcement bureau officers were conducting surveillance of the area and uniformed officers were waiting to make the stop.

"At approximately 5:15 p.m., the time stated by the informant, Chute and the informant observed a gold, four door Nissan Stanza, occupied by two Hispanic males, drive south on Stanley Street, turn east onto Park Street and continue eastbound on Park Street. The informant pointed to the vehicle and told Chute that it was the car they were waiting for. Chute began to follow the vehicle down to Fairview Street where it made a U-turn and proceeded in the opposite direction. Fearing that he would be detected, Chute discontinued following the Nissan.

"Other officers continued the surveillance of the Nissan at Fairview and Park Streets. Officer Chute heard

over the police radio that the Nissan was heading back toward the secondary location at Stanley Street approaching the Citgo station at the corner of East Main Street and Stanley Streets. When a marked patrol car with uniformed officers got behind the Nissan, they were ordered to stop it. The stop was made approximately three meters, less than ten feet, from the entrance to the Citgo station.

"The defendant was the driver of the Nissan and the front seat passenger was identified as Pablo Perez. As Officer Raymond Grzegorzek approached the stopped vehicle, he observed Perez leaning over as if to grab or hide something, but he could not see his hands. Perez's movements aroused Grzegorzek's suspicions that he might be reaching for a weapon or hiding contraband. Perez was forcibly removed from the car. Once both individuals were removed from the vehicle, Grzegorzek searched the passenger compartment and found a bag under the front passenger seat containing 350 packets of heroin."

After setting forth the applicable law, the court concluded that the officers had probable cause to believe that the defendant's automobile contained heroin and that "the on the scene search of the gold Nissan without a warrant was reasonable under all of the circumstances of this case." The court relied on its finding that Jusino had a history of providing reliable information to Chute and his colleagues at the New Britain police department—information that yielded "positive results." The court also relied on the fact that prior to the search, Chute had corroborated the detailed information related by Jusino in the present case. Chute confirmed that the information was, in fact, reliable.

As he did at trial, the defendant challenges the court's conclusion that probable cause existed to justify a search of his vehicle. The defendant argues that proba-

ble cause did not exist because the police officers relied on the word of an untested confidential informant who was not shown to be reliable. The defendant also argues that the officers did not undertake "some corroborative investigation" in order to establish probable cause.

We first set forth our standard of review. "Under the exclusionary rule, evidence must be suppressed if it is found to be the fruit of prior police illegality. . . . On appeal, we apply a familiar standard of review to a trial court's findings and conclusions in connection with a motion to suppress. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . . Whether the trial court properly found that facts submitted were enough to support a finding of probable cause is a question of law. . . . Because a trial court's determination of the validity of a . . . search [or seizure] implicates a defendant's constitutional rights, however, we engage in a careful examination of the record to ensure that the court's decision was supported by substantial evidence. . . . However, [w]e [will] give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses." (Citations omitted; internal quotation marks omitted.) *State v. Reynolds*, 264 Conn. 1, 42–43, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004).

"The Fourth Amendment to the United States constitution protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search and seizures. Ordinarily, police may not conduct a search unless they first obtain a

search warrant from a neutral magistrate after establishing probable cause. [A] search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions. . . . These exceptions have been jealously and carefully drawn . . . and the burden is on the state to establish the exception." (Citations omitted; internal quotation marks omitted.) *State* v. *Badgett*, 200 Conn. 412, 423–24, 512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986).

One such exception permits a warrantless search and seizure "where there is probable cause to believe that a motor vehicle contained contraband or evidence pertaining to a crime . . . ." Id., 424; see also *State* v. *Smith*, 257 Conn. 216, 228–29, 777 A.2d 182 (2001); *State* v. *Miller*, 227 Conn. 363, 377, 378–87, 630 A.2d 1315 (1993); *State* v. *Dukes*, 209 Conn. 98, 120, 547 A.2d 10 (1988). Here, the defendant argues that the warrantless search of his vehicle was unconstitutional because the state failed to demonstrate that the police had probable cause to search the automobile that he had been driving prior to his arrest.

"Probable cause to search exists if: (1) there is probable cause to believe that the particular items sought to be seized are connected with criminal activity or will assist in a particular apprehension or conviction . . . and (2) there is probable cause to believe that the items sought to be seized will be found in the place to be searched. . . . *State* v. *Vincent*, 229 Conn. 164, 171, 640 A.2d 94 (1994). The determination of whether probable cause exists under the fourth amendment to the federal constitution, and under article first, § 7, of our state constitution, is made pursuant to a totality of circumstances test. *Illinois* v. *Gates*, 462 U.S. 213, 231–32, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983); *State* v. *Barton*, 219 Conn. 529, 544, 594 A.2d 917 (1991). Under the

*Gates* test, a court must examine all of the evidence relating to the issue of probable cause and, on the basis of that evidence, make a commonsense, practical determination of whether probable cause existed. See *State* v. *Barton*, supra, 544. We have said that the question is whether there is a fair probability that the contraband was in the place to be searched. *State* v. *Vincent*, supra, 172." (Internal quotation marks omitted.) *State* v. *Smith*, supra, 257 Conn. 223. Where, as here, the police relied on information provided to them by an informant, an examination of the informant's reliability (or veracity) and the basis of his or her knowledge should be regarded as highly relevant in determining whether, under the "totality of the circumstances," probable cause existed. Id., 223–24; *State* v. *Barton*, supra, 537–38; *State* v. *Velasco*, 248 Conn. 183, 192, 728 A.2d 493 (1999).

Our Supreme Court has "consistently held that an informant's record of providing information that led to arrests and seizures of contraband is sufficient to establish the reliability of the informant." *State* v. *Smith*, supra, 257 Conn. 224. Here, the court found that Chute and Jusino had worked together on prior narcotics cases. The court found that Jusino had provided information that led to arrests and seizures of contraband that, on one occasion, consisted of fifty packets of heroin and, on another occasion, consisted of three kilograms of heroin. The court also referred to Chute's knowledge of the fact that Jusino had "worked with" and provided "reliable" information to other New Britain police officers. On the basis of those undisputed facts, the court properly concluded that Jusino was reliable.

The defendant argues that Jusino and Chute "had an extremely short history together," one that lasted less than one month. The defendant describes Jusino's "track record" as an informant to be "short, unimpres-

sive, undetailed and of extremely recent vintage." The defendant points out that the record is silent as to whether Jusino's prior information had led to any convictions. There is no bright line test with which to assess an informant's reliability. The police in the present case did not rely on an anonymous tip from Jusino; Chute's existing relationship with her as it related to prior narcotics cases was sufficient. Further, the defendant's argument that the record does not disclose that Jusino's information in prior cases had led to convictions is not persuasive. Our courts have looked to a record of providing information that has led to arrests and seizures of contraband, not necessarily convictions related thereto.

With regard to an informant's basis of knowledge, our Supreme Court has stated that "[g]enerally, it may be said that the surest way to establish a basis of knowledge is by a showing that the informant is passing on what is to him first-hand information . . . [as] when a person indicates he has overheard the defendant planning or admitting criminal activity . . . ." (Internal quotation marks omitted.) *State* v. *Smith*, supra, 257 Conn. 225. Here, the court found that, *in Chute's presence*, Jusino spoke to the defendant and made arrangements for the delivery of narcotics. The court also noted that Jusino told Chute that she chose the delivery locations because she had used the locations in prior narcotics purchases from the defendant and his criminal associates. Those undisputed findings demonstrate that Jusino overheard the defendant planning criminal activity. Such firsthand information was a sure way of demonstrating the informant's basis of knowledge.[3]

The defendant further argues that the police were "obligated to undertake some corroborative investiga-

---

[3] In his brief, the defendant concedes that the state demonstrated that an adequate basis of knowledge existed.

tion [of Jusino's information] in order to establish probable cause . . . ." In considering the totality of the circumstances, we are mindful that the "police investigation confirming details of the informant's report may establish that the informant obtained the information in a reliable way." *State* v. *Smith*, supra, 257 Conn. 226. Stated otherwise, evidence that police verified the information supplied by an informant typically will bolster the fact that probable cause existed or will in itself afford the police probable cause, if it was theretofore lacking. *State* v. *Velasco*, supra, 248 Conn. 194.

Here, the scope of the police investigation prior to the search and seizure is undisputed; the court detailed its findings concerning the surveillance of the primary and secondary delivery locations related by Jusino, as well as what the police surveillance yielded. The defendant maintains that such investigation was inadequate because it did not corroborate any criminal activity. The defendant argues, "Nothing observed by police during the surveillance corroborated Jusino's claim *that there were narcotics* in the car." (Emphasis in original.) Contrary to the defendant's assertion, an investigation may be sufficiently corroborative of an informant's information if it corroborates significant details of such information, not necessarily criminal activity.

Here, the court found that police surveillance verified significant details related by Jusino. Jusino herself pointed out the defendant to Chute. The defendant and Perez matched the physical description supplied by Jusino. They drove by in an automobile that matched the description supplied by Jusino. They drove to locations described by Jusino at the time that she said they would. Further, we are mindful of the court's finding that when Grzegorzek approached the defendant's stopped automobile, "he observed Perez leaning over as if to grab or hide something" and that Perez had to be forcibly removed from the automobile. That behavior was sug-

gestive of criminal activity and supported a finding of probable cause.

On the basis of the court's findings concerning the events leading to the search and seizure—the informant's reliability and basis of knowledge, the police surveillance that corroborated key details about the narcotics delivery related by Jusino as well as the behavior of Perez when police approached the stopped automobile—we have little difficulty in agreeing with the court's conclusion that the police had probable cause to believe that heroin would be found in the automobile. Accordingly, we reject the defendant's claim that the search and seizure violated his constitutional rights. The court properly denied the defendant's motion to suppress.

## II

The defendant next claims that the court improperly permitted the state to introduce evidence of prior misconduct. We disagree.

The record reflects that prior to conducting his redirect examination of Chute, the prosecutor indicated that he wanted to present testimony from Chute and Jusino concerning prior misconduct by the defendant, specifically, that the defendant had sold drugs to Jusino on prior occasions. The prosecutor argued that such evidence was admissible to rebut the defense suggestion, made evident through its cross-examination of Chute, that the defendant was an "innocent bystander," unaware of the heroin in the automobile he was driving immediately prior to his arrest. The prosecutor also argued that the defendant's attorney had suggested that the defendant was "innocently traveling" near the locations under surveillance immediately prior to the arrest. During argument on the defendant's motion in limine, the defendant's attorney acknowledged that he sought to demonstrate that the defendant did not know that

there was heroin in the automobile.[4] The state argued that testimony concerning prior drug sales by the defendant to Jusino was relevant to demonstrate his knowledge of the narcotics in the automobile as well as to demonstrate his criminal scheme to sell them to Jusino. The defendant argued that any evidence concerning a prior narcotics transaction would unduly prejudice him. The court sustained the defendant's objection insofar as it related to Chute's testimony.

The court heard additional argument on the defendant's objection to the line of inquiry prior to the state's direct examination of Jusino.[5] The prosecutor reiterated that in light of the defense being asserted by the defendant, it was essential that the state be permitted to demonstrate both that the defendant knew of the heroin in the automobile and that he intended to sell it to Jusino. The prosecutor argued that the proffered evidence was relevant to those issues. The defendant again objected on the ground that the probative value of the testimony "does not come close to outweighing its prejudicial nature." After permitting the parties to conduct a voir dire examination of Jusino outside of the presence of the jury, the court overruled the defendant's objection, reasoning that the probative value of the testimony outweighed its prejudicial effect.

The state thereafter elicited testimony from Jusino that on three or four occasions prior to April 15, 2002, she had purchased drugs, including heroin, from the defendant. For example, Jusino recalled previously hav-

---

[4] The record reflects that the defendant elicited evidence that the automobile that he was driving was not registered to him, that the bag containing the heroin was at least partially hidden under the passenger seat, rather than the driver's seat, and that he had not stopped voluntarily at either of the delivery locations identified by Jusino.

[5] Prior to trial, the defendant filed a motion in limine to preclude the state from presenting evidence from Jusino concerning his prior narcotics sales to her.

ing purchased approximately "half a stack to a stack" of heroin from the defendant. She testified that during prior narcotics purchases from the defendant, she had met him on Park and Stanley Streets in New Britain and that he had arrived at those locations in either a gold Nissan or a minivan. She testified that another individual accompanied the defendant to deliver the drugs on at least two of the prior occasions.

The defendant claims that the court's admission of the evidence reflects an abuse of discretion. Although the defendant concedes that the prior misconduct evidence was relevant to the issues of his intent and knowledge, which he likewise concedes were issues in the case, he argues that the prejudicial effect of the evidence on the jury outweighed what he describes as the "limited" probative value of the evidence.

The principles governing the admissibility of other misconduct by a defendant are codified in § 4-5 (a) and (b) of the Connecticut Code of Evidence. "Evidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character or criminal tendencies of that person." Id., § 4-5 (a). "Evidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a), such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate critical prosecution testimony." Id., § 4-5 (b). If the evidence of other misconduct is relevant to a proper purpose, such evidence "may be excluded if its probative value is outweighed by the danger of unfair prejudice . . . ." Id., § 4-3. "When evidence of this type is offered, the trial court must still consider whether its prejudicial tendency outweighs its probative value before ruling upon its admissibility." (Internal quotation marks omitted.) *State* v. *Braman*, 191 Conn. 670, 676, 469 A.2d 760 (1983).

"Our standard of review on such matters is well established. The admission of evidence of prior uncharged misconduct is a decision properly within the discretion of the trial court. . . . [E]very reasonable presumption should be given in favor of the trial court's ruling. . . . [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. . . . The problem is . . . one of balancing the actual relevancy of the other crimes evidence in light of the issues and other evidence available to the prosecution against the degree to which the jury will probably be roused by the evidence." (Internal quotation marks omitted.) *State* v. *Colon*, 272 Conn. 106, 333, 864 A.2d 666 (2004).

Here, the evidence of prior criminal activity was relevant because it tended to make it more probable that the defendant had knowledge of the heroin in the automobile and that he intended to deliver the heroin to Jusino. If the jury believed that Jusino had purchased heroin from the defendant prior to April 15, 2002, in the manner that she described, such a finding would have made it considerably less probable that the defendant was unaware that he was transporting heroin, or that he merely was a victim of circumstance, on April 15, 2002. The defendant claims that the evidence was prejudicial to him. We agree. The issue, however, is whether the evidence was unduly prejudicial to the defendant. "[A]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury." (Internal quotation marks omitted.) *State* v. *Eastwood*, 83 Conn. App. 452, 465, 850 A.2d 234 (2004).

The probative value of the evidence with regard to the issues of the defendant's knowledge and criminal intent was high. Knowledge and intent are often proven by circumstantial evidence because direct evidence rarely is available. *State* v. *Hersey,* 78 Conn. App. 141, 166, 826 A.2d 1183, cert. denied, 266 Conn. 903, 832 A.2d 65 (2003). Jusino's testimony was highly relevant as to those issues because of the similarities between the prior criminal events related by Jusino and the events at issue in the present case. Jusino testified that she had purchased heroin from the defendant after contacting him by telephone. Here, the state attempted to prove that the defendant was delivering heroin to Jusino in response to her telephone conversation with him. Jusino specifically described prior purchases of heroin from the defendant. Here, the state presented evidence that 350 stacks of heroin were found in the automobile that the defendant was driving just prior to his arrest. The informant testified that prior heroin sales occurred at a location near the place of the defendant's arrest. In one or more of the prior transactions, the defendant arrived at the delivery location driving the same vehicle that he was driving at the time of his arrest. In at least two of the prior occasions, the defendant was accompanied by another individual. Here, Perez accompanied the defendant. In short, the evidence tended to disprove the defense that the defendant did not know that he was driving an automobile that contained 350 packets of heroin. Because of the similarities between the defendant's conduct in prior heroin sales to Jusino and his conduct on April 15, 2002, the evidence made it highly probable that the defendant was a knowing participant in a heroin sale that was about to take place at the time and location of his arrest.

We conclude that the court properly determined that the probative value of the evidence outweighed its prejudicial effect. The admission of evidence of a defen-

dant's prior criminal conduct does raise concerns that a jury might misuse the evidence by considering it as evidence of a defendant's bad character or criminal tendencies. "Proper limiting instructions often mitigate the prejudicial impact of evidence of prior misconduct." *State* v. *Ryan*, 182 Conn. 335, 338 n.5, 438 A.2d 107 (1980). Here, the court adequately instructed the jury as to the role the evidence was to play in its deliberations. Specifically, the court instructed the jury not to consider the evidence as proof of the defendant's bad character or criminal tendencies, but solely as evidence of the defendant's intent and knowledge. The court instructed the jury that it could not consider the evidence for "any other purpose."

We conclude that the court's evidentiary ruling did not reflect an abuse of discretion. The evidence was relevant to issues in the case, and its probative value outweighed its prejudicial effect.

## III

The defendant next claims that the court improperly permitted the state to present certain prior consistent statements by Jusino as substantive evidence. We disagree.

The record reveals that during cross-examination of Chute, the defendant's attorney asked whether Jusino had identified the defendant by either his name or a nickname. Chute replied that Jusino had not so identified the defendant or his accomplice. Chute testified that she had "just said two Hispanic males." During his initial examination by the state and by the defendant, Chute was not questioned with regard to the occurrence of or what Jusino may have told him concerning any narcotics transactions between the defendant and Jusino prior to April 15, 2002.[6]

---

[6] As we noted in our discussion in part II, the court precluded the state from eliciting testimony from Chute concerning prior narcotics transactions between the defendant and the informant.

During the state's direct examination of Jusino, she testified with regard to what she told Chute about the defendant on April 15, 2002. In accordance with the court's evidentiary ruling, which permitted the state to present testimony concerning prior narcotics transactions between the defendant and Jusino, she also testified about her criminal relationship with the defendant prior to April 15, 2002.

During both his cross-examination and recross-examination of Jusino, the defendant's attorney asked Jusino whether she had identified the defendant to Chute as "Chico Loco" prior to arranging the heroin purchase. Jusino testified that she had so identified the defendant to Chute. During cross-examination, Jusino testified, as she had on direct examination, that she purchased narcotics from the defendant "three or four" times just "two or three days" prior to April 15, 2002. The following colloquy then transpired between the defendant's attorney and Jusino:

"[Defense Counsel]: And I assume you told Officer Chute these exact dates when—the three or four times that he sold you narcotics. Correct?

"[The Witness]: Not the exact days, no.

"[Defense Counsel]: No. Even though it's two or three days before your—

"[The Witness]: Yeah.

"[Defense Counsel]:—meeting with Officer Chute, you didn't mention to him that two or three days previously, [the defendant] had sold you narcotics roughly three to four times on that . . . one day. You didn't tell him that?

"[The Witness]: No.

"[Defense Counsel]: No. Did you tell Officer Chute that . . . you had purchased narcotics from the defendant before?

"[The Witness]: Yes.

"[Defense Counsel]: But you didn't mention that specific instance, when he sold you narcotics . . . three or four times, two or three days before April 15?

"[The Witness]: No.

"[Defense Counsel]: Okay."

The defendant's attorney revisited that line of inquiry during his recross-examination of Jusino. The defendant's attorney again asked Jusino whether she had, in fact, told Chute that she had purchased narcotics from the defendant two or three days prior to April 15, 2002. The defendant's attorney stated: "You didn't tell [Chute] that two or three days before, you had purchased [narcotics] from [the defendant] three to four times. You left that out. Correct?" Jusino reiterated that she had not told Chute those details about the prior narcotics transactions. On redirect examination, the prosecutor asked Jusino whether on April 15, 2002, she had informed Chute that she had purchased drugs from the defendant "in the past, prior to April 15," and Jusino replied affirmatively.

During direct examination, Jusino testified that she has been convicted of crimes related to the sale and possession of narcotics. Jusino also testified that prior to giving Chute the information that led to the defendant's arrest, she had not been promised any money or "anything with regard to [her] court cases." Jusino testified, however, that Chute gave her $250 after the defendant's arrest. The defendant's attorney asked Jusino several questions concerning her motivation for cooperating with Chute and testifying at trial. The defendant's attorney asked Jusino whether she had met

with the prosecutor, what the prosecutor discussed with her and whether the prosecutor informed her that if she testified truthfully at trial "and if [she] asked, he could possibly talk to a judge on [her] behalf." Jusino testified that she had spoken with the prosecutor, that he discussed her testimony with her and that he had not told her that he could speak to a judge on her behalf. Jusino later testified that she had spoken with the prosecutor and that he had informed her that if she testified truthfully at trial and she asked him to speak to a judge on her behalf, he would "inform a judge" of her testimony. During his recross-examination, the defendant's attorney characterized this assistance by the prosecutor on Jusino's behalf as "consideration" and "a favor."

After Jusino left the witness stand, the prosecutor informed the court that he wanted to recall Chute to the witness stand. The prosecutor stated that he wanted to elicit testimony from Chute that on April 15, 2002, Jusino told Chute that she had purchased narcotics from the defendant on prior occasions. The prosecutor reminded the court that earlier in the trial, it had precluded the state from eliciting such testimony as evidence of the defendant's knowledge or intent. The prosecutor argued that he now wanted to elicit the testimony for a different purpose, as Jusino's prior consistent statement. Essentially, the prosecutor argued that the defendant had attempted to impeach Jusino by suggesting that on April 15, 2002, she did not disclose relevant information to Chute about her prior narcotics transactions with the defendant. The prosecutor argued that the defendant had attempted to demonstrate that after the prosecutor had offered to assist Jusino in some manner in exchange for her testimony at trial, Jusino revealed those details about her prior criminal relationship with the defendant at trial. The prosecutor suggested that the defendant's attorney had called into question Jusino's veracity on those matters and inferred

that her testimony on those matters was "a recent con-
trivance to make [the defendant] sound more guilty."
He argued that the state "[needed] to establish that
before [Jusino] knew of any potential consideration,
without any money being given over to her prior to the
seizure, without any court considerations being
offered," the informant had disclosed to Chute that she
had purchased narcotics from the defendant prior to
April 15, 2002. The defendant's attorney objected on
the ground that the hearsay testimony was cumulative
evidence that "does nothing except prejudice" the
defendant. Specifically, the defendant argued that the
testimony would be prejudicial because it was from a
witness who was "far more credible" than Jusino. The
defendant further argued that "the state has a shaky
witness here, and [the prosecutor is] trying to buttress
. . . her shaky past with the statement she allegedly
made to [Chute]."

The court permitted the state to recall Chute and to
examine him in the manner requested. Chute testified
that on April 15, 2002, Jusino told him that on prior
days, the defendant had sold and delivered heroin to her
in the area of Park and Stanley Streets in New Britain.

In the first part of the defendant's claim on appeal,
he argues that the admission of the prior consistent
statement by Jusino was "premature" because he did
not attempt to impeach Jusino, as the state argued, by
suggesting that her testimony concerning prior drug
purchases from the defendant had been recently fabri-
cated. The defendant argues that he "in no way implied
that the statement was being fabricated for the first
time at trial."

The general rule is that "the credibility of a witness
may not be supported by evidence of a prior consistent
statement made by the witness." Conn. Code Evid. § 6-
11 (a). "If the credibility of a witness is impeached by

. . . (3) a suggestion of recent contrivance, evidence of a prior consistent statement made by the witness is admissible, in the discretion of the court, to rebut the impeachment." Id., § 6-11 (b). "Impeachment on the ground of recent contrivance . . . is more nearly connected with the case of impeachment by self-contradiction. The charge of recent contrivance is usually made, not so much by affirmative evidence, as by negative evidence that the witness did *not* speak of the matter before, at a time when it would have been natural to speak; his silence then is urged as inconsistent with his utterances now, i.e., as a self-contradiction . . . . The effect of the evidence of consistent statements is that the supposed fact of not speaking formerly, from which we are to infer a recent contrivance of the story, is disposed of by denying it to be a fact, inasmuch as the witness did not speak and tell the same story . . . ." (Internal quotation marks omitted.) *State* v. *Dolphin*, 178 Conn. 564, 568 n.5, 424 A.2d 266 (1979). We afford the trial court "broad discretion" in admitting that type of evidence. Conn. Code Evid. § 6-11, commentary.

Having reviewed the defendant's examinations of Jusino, we conclude that the court did not abuse its discretion by permitting the state to present Jusino's prior consistent statements. By means of his questioning, the defendant suggested that Jusino recently contrived her statements concerning her narcotics purchases from the defendant prior to April 15, 2002. The defendant did so by belaboring the point that Jusino allegedly failed to disclose details about those transactions to Chute on April 15, 2002, but that she disclosed such details at the time of trial. Furthermore, the defendant strongly implied that Jusino's testimony at trial in that regard was the result of self-interest. The defendant elicited evidence that shortly before trial, Chute informed Jusino that he could provide some degree of compensation to Jusino in relation to the quality of her

testimony at trial. It was reasonable for the court to conclude that the defendant attempted to impeach Jusino on the ground of recent contrivance. Accordingly, the admission of the prior consistent statement was not premature. Cf. *State* v. *Fasano*, 88 Conn. App. 17, 39–40, 868 A.2d 79 (2005) (prior consistent statement properly precluded where witness' credibility not yet challenged). The court properly concluded that Chute's testimony was permissible to rebut the impeachment of Jusino by the defendant.

Having concluded that the testimony was admissible, we next address the second part of the defendant's claim on appeal. The defendant claims that the court improperly admitted the statements as substantive evidence. The defendant correctly points out that the court did not instruct the jury that the evidence was admitted for a limited purpose and that it could consider the testimony solely for the purpose of assessing Jusino's credibility.

It is well settled that "[w]here the prior consistent statement becomes admissible, it may not be used as substantive evidence of the facts contained therein, but only to rehabilitate the credibility of the witness which has been attacked." (Internal quotation marks omitted.) *State* v. *Lewis*, 67 Conn. App. 643, 652, 789 A.2d 519, cert. denied, 261 Conn. 938, 808 A.2d 1133 (2002); see also Conn. Code Evid. § 6-11, commentary (prior consistent statements admissible for limited purpose of repairing credibility and are not substantive evidence).

It is clear from the record that the court admitted the evidence for the limited purpose of assessing Jusino's credibility and not as substantive evidence.[7] The record

---

[7] The defendant apparently argues that the court admitted the prior consistent statements as substantive evidence because the court did not deliver a limiting instruction. The defendant relies on *State* v. *Brown*, 187 Conn. 602, 604–12, 447 A.2d 734 (1982). In *Brown*, the trial court admitted a witness' prior statement on the basis of its "relevance to [the witness'] credibility." Id., 607. The court did not deliver a limiting instruction. Id. Our Supreme

reveals that the defendant neither requested a limiting instruction nor excepted to the court's failure to give an instruction sua sponte.[8] Although the defendant objected to the admission of the evidence, he did not challenge the court's failure to deliver a limiting instruction at trial. The defendant claims that "[a] limiting instruction was a necessary part of the admission of the statements" and that he is not pursuing a separate instructional claim on appeal. The defendant views his instructional claim, which he did not preserve for our review, as being intertwined with his claim that the court improperly admitted the prior consistent statements. The defendant has failed to persuade us that those claims are not distinct[9] and does not cite to any authority to support the proposition that the court's failure to deliver a limiting instruction affected the admissibility of the evidence. The defendant has failed

Court concluded that the trial court improperly admitted the statement because the court had not admitted it "solely for the purpose of rehabilitating an impeached witness." Id., 609. Although the Supreme Court observed that the trial court failed to deliver a limiting instruction with regard to that statement, it first determined that it was inadmissible as a prior consistent statement. Id., 609 n.2. *Brown* is distinguishable from the present case where, as we have already concluded, the court properly admitted the statements as prior consistent statements of the witness.

[8] As we stated in part II, the court delivered a limiting instruction with regard to any evidence admitted concerning prior misconduct by the defendant. The court instructed the jury that such evidence was admitted solely for the issues of the defendant's intent and knowledge. The defendant acknowledges that this instruction applied to the evidence at issue in this claim, but argues that an additional limiting instruction was necessary with regard to Chute's testimony concerning the prior statements by Jusino.

[9] There is ample authority in support of the proposition that a claim that a court failed to instruct a jury properly with regard to evidence admitted for a limited purpose is distinct from a claim related to the admissibility of such evidence. See, e.g., *State* v. *Cator*, 256 Conn. 785, 797–802, 781 A.2d 285 (2001) (addressing separately claims that court improperly admitted evidence of prior misconduct and improperly failed to deliver limiting instruction concerning such evidence); *State* v. *Carter*, 84 Conn. App. 263, 277–79, 853 A.2d 565 (same), cert. denied, 271 Conn. 932, 859 A.2d 931 (2004); *State* v. *Johnson*, 65 Conn. App. 470, 475–79, 783 A.2d 1057 (same), cert. denied, 258 Conn. 930, 783 A.2d 1031 (2001).

to seek review of his unpreserved claim related to the limiting instruction pursuant to either *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), or the plain error doctrine, codified in Practice Book § 60-5. The defendant has failed to present an exceptional basis for review of the claim, and it is well settled that this court will not engage in a level of review that has not been requested. *State* v. *Aloi*, 86 Conn. App. 363, 379, 861 A.2d 1180 (2004), cert. granted on other grounds, 273 Conn. 901, 867 A.2d 840 (2005).

IV

Finally, the defendant claims that prosecutorial misconduct during the state's closing argument deprived him of a fair trial. The defendant concedes that he did not preserve his claim for our review and argues that review is warranted under *State* v. *Golding*, supra, 213 Conn. 239–40. We will review the claim following the analytical approach set forth in *State* v. *Stevenson*, 269 Conn. 563, 572–73, 849 A.2d 626 (2004). "[F]ollowing a determination that prosecutorial misconduct has occurred, regardless of whether it was objected to, an appellate court must apply the . . . factors [set forth in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987)] to the entire trial." *State* v. *Stevenson*, supra, 575.

"[P]rosecutorial misconduct of a constitutional magnitude can occur in the course of closing arguments." (Internal quotation marks omitted.) *State* v. *Colon*, supra, 272 Conn. 237. "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Rizzo*, 266 Conn. 171, 245–46, 833 A.2d 363 (2003).

"Claims of prosecutorial misconduct trigger a two-pronged inquiry. First, we must examine the allegedly improper conduct to determine if it was, in fact, improper and rose to the level of prosecutorial misconduct. If it did, we will analyze the effect of the misconduct to determine if it deprived the defendant of a fair trial. . . . Generally, [i]n evaluating a prosecutorial misconduct claim, we review whether the record discloses a pattern of misconduct pervasive throughout the trial or conduct that was so blatantly egregious that it infringed on the defendant's right to a fair trial. . . .

"In determining whether the defendant was denied a fair trial we must view the prosecutor's comments in the context of the entire trial. . . . In examining the prosecutor's argument we must distinguish between those comments whose effects may be removed by appropriate instructions . . . and those which are flagrant and therefore deny the accused a fair trial. . . . The defendant bears the burden of proving that the prosecutor's statements were improper in that they were prejudicial and deprived him of a fair trial. . . . In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted; internal quotation marks omitted.) *State* v. *McKiernan*, 78 Conn. App. 182, 195–96, 826 A.2d 1210, cert. denied, 266 Conn. 902, 832 A.2d 66 (2003). Additionally, a reviewing court must give due consideration to whether the defendant objected, requested a curative instruction to the jury or moved

for a mistrial on the basis of the misconduct. See *State
v. Ancona*, 270 Conn. 568, 593, 854 A.2d 718 (2004),
cert. denied, 543 U.S. 1055, 125 S. Ct. 921, 160 L. Ed.
2d 780 (2005); *State v. Rowe*, 85 Conn. App. 563, 574–75,
858 A.2d 792, cert. granted in part on other grounds,
272 Conn. 906, 863 A.2d 699 (2004).

A

The defendant claims that the prosecutor improperly
"denigrated the role of defense counsel" during closing
argument. The remarks of which the defendant com-
plains follow.

During his closing argument, the defendant's attorney
argued that there were "two big problems" with the
state's case. First, the defendant's attorney argued that
the state failed to prove that the defendant had narcotics
"on him" at the time of his arrest. Second, the defen-
dant's attorney argued, at length, that there were several
reasons why Jusino was not a credible witness. The
defendant's attorney argued that the evidence demon-
strated that Jusino was "a three time convicted felon
and [an] admitted drug seller" who had a narcotics
case pending at the time of the defendant's arrest. The
defendant's attorney also referred to what he deemed
to be contradictions in Jusino's trial testimony. In that
regard, he pointed out that Jusino originally testified
that she had not been offered consideration by the
prosecutor for her testimony, but later admitted that
the prosecutor offered to "approach a judge on her
behalf" as a result of her testimony. The defendant's
attorney argued that the evidence demonstrated that
Jusino was motivated by self-interest; he suggested that
she had a motive to help Chute and to testify at trial
in exchange for favorable treatment in her pending
criminal trial. According to the defendant's attorney,
the evidence reasonably demonstrated that Jusino had
asked the defendant to meet her at the place of his

arrest for a social encounter, not to deliver narcotics to her, and that the defendant did not know that there were narcotics in the automobile he was driving at the time of his arrest.

During the beginning of his closing argument, the prosecutor stated: "Now, ladies and gentlemen, this case is about what happened on April 15, 2002. Mr.— the defense has tried to make it about other things, and I'll address those in my rebuttal. But it's about April 15, 2002."

During his rebuttal argument, the prosecutor stated: "[The defendant's attorney] would like to make this case about whether you would have Jessica Jusino over for dinner. That's not what this case is about. This case is about one thing and one thing only: Is there proof beyond a reasonable doubt that this defendant possessed narcotics with intent to sell on that date?" The prosecutor discussed the defendant's attempt to discredit Jusino's testimony by referring to her criminal history and arguing that she had a motive to testify as she did. The prosecutor then argued: "Can you keep your eye on the main event or do you get the focus shifted? And I ask you that . . . question for one reason. The tactic of [a] defense lawyer is to shift the focus. The case is not about what they'd like it to be about: the likability of Jessica Jusino. That's not what it's about. What it's about is whether—is this defendant, having that massive quantity of narcotics in his automobile and planning the drug deal with her over the telephone moments previous. That's what this case is about."

The prosecutor thereafter referred to the defendant's attempt to impeach Jusino by arguing that she was motivated to testify as she did by the prosecutor's offer to speak to a judge on her behalf if she testified truthfully at trial. The prosecutor attempted to discredit that

argument as follows: "There's nothing in here, ladies and gentlemen, that indicates anything untoward, anything unfair, anything that would give her a motivation [to testify untruthfully]. And what's most important about that, what illustrates that most of all is this: her testimony—the evidence shows I didn't meet this woman until—what was it, the Monday before last?

"So, on April 15, how could she have been motivated by some statement I made to her five days before the testimony or six days before the testimony? Doesn't make any sense. It's just more smoke and mirrors and more shifting of the focus away from this defendant and his narcotics and back onto Jessica Jusino."

"While a prosecutor may argue the state's case forcefully, such argument must be fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Furthermore, [t]he prosecutor is expected to refrain from impugning, directly or through implication, the integrity or institutional role of defense counsel." (Citation omitted; internal quotation marks omitted.) *State* v. *Chasse*, 51 Conn. App. 345, 357–58, 721 A.2d 1212 (1998), cert. denied, 247 Conn. 960, 723 A.2d 816 (1999). There is a distinction between argument that disparages the integrity or role of defense counsel and argument that disparages a theory of defense. *State* v. *Jenkins*, 70 Conn. App. 515, 535–38, 800 A.2d 1200 (holding that challenged argument fell within bounds of proper commentary on defendant's theory of defense), cert. denied, 261 Conn. 927, 806 A.2d 1062 (2002); *State* v. *Perry*, 58 Conn. App. 65, 71–72, 751 A.2d 843 (same), cert. denied, 254 Conn. 914, 759 A.2d 508 (2000).

The defendant argues that the challenged remarks were of the same nature as remarks that this court held to be improper in *State* v. *Young*, 76 Conn. App. 392, 400–406, 819 A.2d 884, cert. denied, 264 Conn. 912, 826

A.2d 1157 (2003), and *State* v. *Brown*, 71 Conn. App. 121, 127–32, 800 A.2d 674, cert. denied, 261 Conn. 940, 808 A.2d 1133 (2002). We conclude that the remarks deemed improper in those cases are distinguishable from those challenged here. This court held that the prosecutors in both *Young* and *Brown* committed the same type of misconduct in their closing argument, i.e., they engaged in argument that impugned the role of defense counsel by suggesting that defense counsel was engaging in typical defense tactics or by comparing the defendant's counsel to defense counsel generally.[10] In *Young*, this court stated that "[i]t is improper for a prosecutor to tell a jury, explicitly or implicitly, that defense counsel is employing standard tactics used in all trials, because such argument relies on facts not in evidence and has no bearing on the issue before the jury, namely, the guilt or innocence of the defendant." *State* v. *Young*, supra, 404. As this court noted in *Brown*, such argument that focuses the jury's attention on the tactics employed by defense counsel in general is improper because it diverts the jury's attention from the issues properly before it and constitutes argument based on evidence not before the jury. *State* v. *Brown*, supra, 129. Here, the prosecutor did not compare the

---

[10] For example, in *Young*, the prosecutor argued, in response to the attempt by the defendant's counsel to cast doubt on a witness' identification of the defendant: "So, you know, I always love it when counsel stands up and says, 'Well, of course, you're going to make an in-court [identification].' That's always a favorite argument to make." *State* v. *Young*, supra, 76 Conn. App. 402. In *Brown*, the prosecutor's remarks were improper to a greater extent. The prosecutor in *Brown* responded to the arguments advanced by the defendant's attorney by comparing the defendant's counsel to other defense counsel. *State* v. *Brown*, supra, 71 Conn. App. 127. In regard to one argument advanced by the defendant's counsel, the prosecutor stated: "Don't fall for that. That is a smoke screen employed by defense attorneys at any trial. [Defense counsel] has been doing this a long time." Id., 128. In regard to another argument advanced by the defendant's counsel, the prosecutor stated that "[defense counsel] has been doing this for a very long time and, as any defense attorney would do, he is trying to convince you, basically, ladies and gentlemen, that this is too hard for you to figure out." Id.

arguments, or tactics, of the defendant's attorney to those of defense counsel generally.

There is ample room, in the heat of argument, for the prosecutor to challenge vigorously the arguments made by defense counsel. It was not improper for the prosecutor to suggest that the defendant's attorney, by allocating a significant share of his closing argument to discussing what he deemed to be weakness in Jusino's credibility and testimony, had attempted to divert the jury's attention away from the defendant's actions on April 15, 2002. See, e.g., *State* v. *Young,* supra, 405 ("prosecutor did not overstep the bounds of permissible argument by telling the jury not to be 'fooled' by defense counsel's arguments or by stating that defense counsel's questions during cross-examination were designed to distract the jury from the real issues in the case"). Here, however, the prosecutor referred to the argument of the defendant's attorney as "smoke and mirrors . . . ." We conclude that this aspect of the prosecutor's argument was improper because it implied, to whatever degree, that the defendant's attorney had not based his argument on fact or reason, but had intended to mislead the jury by means of an artfully deceptive argument. The prosecutor implied that the defendant's attorney intended to deceive and thereby impugned the integrity of the defendant's attorney. For that reason, the argument constituted prosecutorial misconduct.

B

The defendant next claims that the prosecutor misrepresented the evidence. It is well established that a "prosecutor, in fulfilling his duties, must confine himself to the evidence in the record. . . . [A] lawyer shall not . . . [a]ssert his personal knowledge of the facts in issue, except when testifying as a witness. . . . Statements as to facts that have not been proven amount to unsworn testimony, which is not the subject of a proper

closing argument. . . . [T]he state may [however] properly respond to inferences raised by the defendant's closing argument. . . .

"A prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to evidence. . . . Moreover, when a prosecutor suggests a fact not in evidence, there is a risk that the jury may conclude that he or she has independent knowledge of facts that could not be presented to the jury." (Citations omitted; internal quotation marks omitted.) *State* v. *Singh*, 259 Conn. 693, 718, 793 A.2d 226 (2002). "A lawyer shall not . . . [i]n trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused . . . ." Rules of Professional Conduct 3.4 (5).

1

During his rebuttal argument, the prosecutor argued as follows: "To believe [the defendant's] story, you'd have to believe that this confidential informant, Jessica Jusino, a New Britain drug dealer, is willing to part with $3500 worth of heroin, $3500. What is she, Rockefeller? She's willing to part with $3500 worth of heroin? It's a major part of a heroin trade. She's willing to part with that just so she can somehow, what, plant it on [the defendant]? I mean, that was the clear implication of his story, that—that she went there, and she was alone, and she put them—that would be absurd. How else did the [cocaine]—did the heroin get there?" The defendant argues that the prosecutor mischaracterized his testimony. The defendant argues that the prosecutor improperly argued that he testified that Jusino planted

the heroin in the automobile he was driving just prior to his arrest. The defendant accurately points out that he did not so testify at trial and that he testified that he did not know that there were any drugs in the automobile.

That aspect of the defendant's claim is without merit because the defendant mischaracterizes the prosecutor's argument. The prosecutor did not mischaracterize the defendant's testimony or base his argument on facts outside of the evidence. The prosecutor explicitly depicted what he deemed to be the *clear implication* of the defendant's testimony. Having reviewed the testimony, we conclude that the argument was not improper. It reflected an invitation for the jury to draw reasonable inferences from the defendant's testimony.

2

The defendant also challenges the prosecutor's statement that at the time of the defendant's arrest, the defendant had "three times the amount he made in three months in his pocket . . . ." As the defendant correctly points out, the evidence demonstrated only that he was carrying $1241 at the time of his arrest, an amount that was approximately one-third of what the defendant earned from his employment during the three-month period preceding his arrest.

Although the defendant has identified a flaw in the prosecutor's argument, we disagree with the defendant that it constituted prosecutorial misconduct. Instead, we conclude that the challenged statement was an isolated misstatement. The prosecutor devoted a significant part of his argument reminding the jury to recall the evidence concerning the money found on the defendant at the time of his arrest. The prosecutor discussed the undisputed evidence of what the defendant earned at his employment and, on more than one occasion, accurately characterized the $1241 that the defendant

was carrying as "more than a third" of what he earned in the approximately three months prior to the date of his arrest. Given the context of the statement, it is clear that it was merely an isolated misstatement of the evidence, one that the jury likely recognized as such.

As a general rule, we do not "dissect every sentence of the prosecutor's argument to discover impropriety." *State* v. *Morgan*, 70 Conn. App. 255, 290, 797 A.2d 616, cert. denied, 261 Conn. 919, 806 A.2d 1056 (2002). "We do not scrutinize each individual comment in a vacuum, but rather we must review the comments complained of in the context of the entire trial. . . . It is in that context that the burden [falls] on the defendant to demonstrate that the remarks were so prejudicial that he was deprived of a fair trial and the entire proceedings were tainted." (Internal quotation marks omitted.) *State* v. *Holmes*, 64 Conn. App. 80, 90–91, 778 A.2d 253, cert. denied, 258 Conn. 911, 782 A.2d 1249 (2001).

## C

The defendant next claims that the prosecutor improperly commented on the defendant's failure to call his brother as a witness. The evidence was undisputed that at the time of his arrest, the defendant was carrying $1241. At trial, the defendant testified that early in the day on April 15, 2002, he had cashed checks that were issued to him and his brother by their employers. The defendant testified that his check was for approximately $780 and his brother's check was for approximately $450. The defendant testified that his brother gave him the check on the Sunday night prior to April 15, 2002, and that his brother knew that he was going to cash his check for him. The defendant further testified that he "needed" cash on the day of his arrest to, among other things, pay his $650 rent bill, which he always paid in cash.

During his rebuttal argument, the prosecutor commented on the defendant's testimony. The prosecutor stated that the evidence did not support the defendant's testimony that he had cashed a check for $780 on April 15, 2002. Further, the prosecutor commented on the defendant's testimony that he had cashed a check for his brother: "Then [the defendant] says . . . I cashed my brother's check, too. We have absolutely no evidence of that: no brother, no check, no nothing." The prosecutor then argued that the evidence that the defendant was carrying the cash at the time of his arrest was consistent with the defendant's role as a drug seller on April 15, 2002. The prosecutor argued: "[L]adies and gentlemen, who carries $1241 in their pockets? People who sell drugs because people who buy drugs pay in cash. They don't use Visa, they don't use Mastercard, and they don't use their checking accounts. That's why he had the $1241."

In *State* v. *Malave*, 250 Conn. 722, 737 A.2d 442 (1999) (en banc), cert. denied, 528 U.S. 1170, 120 S. Ct. 1195, 145 L. Ed. 2d 1099 (2000), our Supreme Court abandoned in criminal cases the missing witness rule that it had adopted in *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 165 A.2d 598 (1960).[11] The court adopted a new rule, permitting counsel to comment, in closing arguments, "about the absence of a particular witness, insofar as that witness' absence may reflect on the weakness of the opposing party's case." *State* v. *Malave*, supra, 739. "So long as counsel does not directly exhort the jury to draw an adverse inference by virtue of the witness' absence, the argument does not fall within the *Secondino* rule" and is permissible. Id. The Supreme

---

[11] Under the so-called *Secondino* rule, a court could instruct a jury that "[t]he failure of a party to produce as a witness one who [1] is available and [2] . . . naturally would be produced permits the inference that such witness, if called, would have exposed facts unfavorable to the party's cause." (Internal quotation marks omitted.) *State* v. *Malave*, supra, 250 Conn. 728–29.

Court, however, restricted a party's right to so argue, stating: "Fairness . . . dictates that a party who intends to comment on the opposing party's failure to call a certain witness must so notify the court and the opposing party in advance of closing arguments. Advance notice of such comment is necessary because commenting on the opposing party's failure to call a particular witness would be improper if that witness were unavailable due to death, disappearance or otherwise. That notice will ensure that an opposing party is afforded a fair opportunity to challenge the propriety of the missing witness comment in light of the particular circumstances and factual record of the case. Of course, the trial court retains wide latitude to permit or preclude such a comment, and may, in its discretion, allow a party to adduce additional evidence relative to the missing witness issue." Id., 740.

Here, the state concedes that it did not notify the court and the defendant that it intended to comment on the defendant's failure to call his brother as a witness. The state argues that its failure to comply with *Malave*'s requirements was harmless because "[t]he defendant included his brother's name on a witness list that he provided [to] the state midtrial, and he informed the court that he might be calling his brother as a witness." The state also points out that the defendant does not claim that his brother was unavailable to testify. The state further argues that the defendant had no obligation to present a defense, but that having chosen to present a defense, the state was permitted to argue that the defendant had failed to prove it.

The prosecutor did not merely attempt to cast doubt on the defendant's explanation for the money he was carrying at the time of his arrest; he drew attention to the fact that the defendant had failed to present his brother as a witness at trial. He did so without providing notice to the court and to the defendant, as was required

by *Malave*. The prosecutor's argument constituted misconduct.

## D

Having identified two instances of misconduct, we next determine whether, as the defendant argues, it substantially prejudiced him so as to deprive him of a fair trial. The misconduct was not invited by the defense, and there were no curative measures adopted by the court. We conclude that the misconduct was not particularly severe, as evidenced by the fact that the defendant did not object to the arguments either at the time they were made or prior to the court's charge. Although a party's failure to object to improper arguments does not preclude a claim of prosecutorial misconduct, "[d]efense counsel's objection or lack thereof allows an inference that counsel did not think the remarks were severe." *State* v. *Santiago*, 269 Conn. 726, 759, 850 A.2d 199 (2004). In concluding that the misconduct was not severe, we recognize that the prosecutor referred to the fact that the defendant failed to call his brother as a witness; he did not directly exhort the jury to infer that the defendant's brother would have harmed the defendant's case.

The prosecutor's use of the term "smoke and mirrors," although improper, was neither strongly critical nor severely condemnatory of the defendant's attorney. The prosecutor's use of the term occurred only once, in the context of a permissible critique of the arguments advanced by the defendant's attorney. We conclude, therefore, that the use of the term was not so egregious as to implicate the due process right of the defendant to a fair trial.

The misconduct was not frequent, occurring in two instances during the state's rebuttal argument. We also conclude that the misconduct was not central to a critical issue in the case. The defendant's possession of

$1241 was circumstantial evidence supporting the state's theory that the defendant was a drug seller. The state's case did not hinge on the fact that the defendant possessed that cash. The prosecutor's improper use of the term "smoke and mirrors" was related to the defendant's legitimate efforts to impeach a witness called by the state, not to the witness, her testimony or any critical issue before the jury.

Finally, we are mindful that the state had a strong case against the defendant, bolstered by ample direct and circumstantial evidence. That evidence reasonably permitted the finding that Jusino, a confidential informant with a positive track record working with police, in Chute's presence arranged the heroin purchase. The defendant and Perez arrived at the drop-off location in the manner described by Jusino. When the police stopped their automobile, they discovered Perez hiding a bag that contained 350 packets of heroin, the amount that Jusino offered to purchase from the defendant. In light of those factors, we conclude that the isolated instances of misconduct did not deprive the defendant of a fair trial.[12]

---

[12] The defendant, to a lesser extent, also argues that "the prosecutor's argument [called] for the defendant to produce some affirmative, neutral explanation for the amount of money in his possession" and that such argument "constitut[ed] a burden shifting argument." The defendant argues that such argument was improper because he "had no obligation to establish a legitimate source for the money he was carrying—it was the state's burden to establish that the money was derived from illegal activity."

"A prosecutor cannot . . . imply that a defendant bears the burden of disproving that he or she committed a crime. In contrast, he or she may comment on a defendant's failure to contradict the state's case or to support adequately his or her theory of defense." *State* v. *Morgan*, supra, 70 Conn. App. 295. We disagree with the defendant that the prosecutor impermissibly suggested that the defendant had the burden of demonstrating his innocence. The defendant testified at trial, setting forth a benign reason why he was carrying $1241 at the time of his arrest. The explanation set forth was not thereafter off limits for critical comment by the prosecutor. The prosecutor, within the proper bounds of argument, had the right to argue that such explanation belied the evidence or the jury's rational review of the evidence.

The judgment is affirmed.

In this opinion the other judges concurred.