STATE OF CONNECTICUT *v.* CASMIER ZUBROWSKI
(AC 28045)

Flynn, C. J., and Bishop and McLachlan, Js.

Argued February 8—officially released May 22, 2007

*Daniel J. Krisch*, special public defender, with whom was *Kenneth J. Bartschi*, for the appellant (defendant).

*Rita M. Shair*, senior assistant state's attorney, with whom were *Scott J. Murphy*, state's attorney, and, on the brief, *Kevin J. Murphy*, senior assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, Casmier Zubrowski, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a. On appeal, the defendant claims that the trial court improperly (1) denied his motion to suppress statements he made to police, (2) instructed the jury

as to the effects of medication and alcohol on his ability to form the specific intent to kill and (3) admitted evidence of prior misconduct. We affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to our discussion of the issues on appeal. On January 1, 2002, the defendant and his wife, the victim, lived in a condominium complex in Bristol. At approximately 7 or 8 p.m., on December 31, 2001, the defendant invited his brother, Bruno Zubrowski, who lived in the same complex, to celebrate New Year's Eve with them at their condominium. During the evening, the brothers and the victim consumed substantial amounts of alcohol, including beer, vodka and schnapps. The defendant consumed most of the vodka and also drank one to two beers. At approximately 10 p.m., an argument ensued concerning the cause of a hole in the drywall in the defendant's home. Feeling uncomfortable with this argument, Bruno Zubrowski decided to return to his own condominium. The defendant accompanied his brother back to his condominium where he "picked up a couple of beers" after which he returned home.

At 12:53 a.m., Officer Albert Myers, a dispatcher for the Bristol police department, received a 911 call from the defendant, who told the officer that his wife was dead, that she had slashed her throat and that she was not breathing. After Myers advised the defendant that assistance would be sent promptly, the defendant stated, "immediately, I mean, this—this may not be half an hour ago. I was upstairs, you know. I don't—the blood is all over." Although the call was terminated abruptly, Myers called back and asked what had happened. The defendant again requested assistance, stating that he thought his wife was dead. Also, in response to Myers' questions, the defendant reiterated that he did not know what had happened, that he and his wife

had gotten into an argument and that his wife said that she was going to slash her throat. The defendant also stated that he had gone upstairs and then had returned downstairs, and "there was blood all over."

Officers Lawrence DeSimone and Thomas Grimaldi responded to the 911 call, arriving at the defendant's home while he was still talking on the telephone with Myers. When the officers knocked on the door, the defendant responded, clad only in white, blood spattered briefs. He told the officers that "his wife had cut her throat and she was dead." The officers and the defendant then walked to the kitchen where the victim was lying motionless on her back on the floor with a substantial amount of blood spread about the kitchen area. The officers also noted that the victim had lacerations about her throat and face and that a knife lay adjacent to her. Faced with this scene, Grimaldi asked DeSimone to take the defendant into the living room.

Once DeSimone escorted the defendant into the living room, he had the defendant sit down and he asked him, "what happened?" The defendant stated that when he arrived home from work, he had found his brother and his wife drinking and that his brother had left shortly after he arrived. He told DeSimone that he and his wife argued about a hole in the drywall at the base of the stairwell and that she said she was going to cut her throat. The defendant stated that because she had made the same threat before, he did not take it seriously and went to bed. He further stated that one hour later, while he was upstairs, he heard a loud crash and called out and heard no answer. He then went downstairs where he found his wife lying on the kitchen floor. He turned her over and attempted to resuscitate her and then ran to his brother's condominium. Getting no response from his brother, he returned home and called the police.

From the house, DeSimone and Grimaldi called Detective Kevin Hayes to investigate. After introducing

himself to the defendant, Hayes asked the defendant to come to the police station and make a statement. At that juncture and unprovoked by any questioning from Hayes, the defendant told him that "she killed herself, you know, she cut her throat, you know," which, in essence, was the same information he had disclosed to the 911 dispatcher and DeSimone. The defendant agreed to accompany Hayes to the police station where he made a written statement, the contents of which were similar to the version of events that he had given to the police at his home.

The defendant subsequently was charged with murder in violation of § 53a-54a. After the jury found the defendant guilty, he was sentenced to a total effective term of imprisonment of thirty-five years.[1] This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court improperly denied his motion to suppress incriminating statements he made to the police. Specifically, he argues that the statements he made in his living room after DeSimone asked him, "what happened?" were not properly admissible at trial because they were made in response to custodial interrogation and without the benefit of *Miranda*[2] warnings. The state contends that even if it was error to admit the defendant's statements at trial because they were taken in violation of *Miranda*, that error was harmless.[3] We agree with the state.

---

[1] After he was found guilty, the defendant then admitted to a violation of probation in a separate matter, Docket No. CR-96-96261-S, arising out of a 1998 conviction for assault in the second degree. The court sentenced the defendant to thirty-five years incarceration for the murder conviction and five years incarceration for the violation of probation, concurrent to the murder sentence.

[2] See *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] The state does not concede that the defendant was in custody or that the question, "what happened?" constituted an interrogation.

"Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by *Miranda*: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police interrogation." *State* v. *Brown*, 199 Conn. 47, 51, 505 A.2d 1225 (1986).

"The defendant bears the burden of proving that he was in custody for *Miranda* purposes. . . . Two discrete inquiries are essential to determine custody: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. . . . The first inquiry is factual, and we will not overturn the trial court's determination of the historical circumstances surrounding the defendant's interrogation unless it is clearly erroneous. . . . The second inquiry, however, calls for application of the controlling legal standard to the historical facts. . . . The ultimate determination of whether a defendant was subjected to a custodial interrogation, therefore, presents a mixed question of law and fact, over which our review is de novo. . . . [T]he term interrogation under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (Citations omitted; internal quotation marks omitted.) *State* v. *Canales*, 281 Conn. 572, 584–85, 916 A.2d 767 (2007).

Although we note that the factual circumstances in this instance present a close question as to whether the defendant was subjected to custodial interrogation, even if we assume arguendo that he was and, thus, that *Miranda* warnings were required, our review of the record reveals that the admission of his statements into

evidence, even if erroneous, was harmless beyond a reasonable doubt.

"The harmless error doctrine is rooted in the fundamental purpose of the criminal justice system, namely, to convict the guilty and acquit the innocent." (Internal quotation marks omitted.) *State* v. *Camacho*, 92 Conn. App. 271, 283, 884 A.2d 1038 (2005), cert. denied, 276 Conn. 935, 891 A.2d 1 (2006). "In order to assess the harmfulness of the error, the test is whether there is a reasonable possibility that the improperly admitted evidence contributed to the conviction. . . . The harmfulness of an error depends upon its impact on the trier and the result . . . . As the United States Supreme Court said in *Chapman* v. *California* [386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)], before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. This court has held in a number of cases that *when there is independent overwhelming evidence of guilt, a constitutional error would be rendered harmless beyond a reasonable doubt.*" (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Hoeplinger*, 206 Conn. 278, 294–95, 537 A.2d 1010 (1988). "The proper standard [therefore] is whether any reasonable jury *would* have found the defendant guilty if the improperly admitted evidence had been excluded." (Emphasis in original.) Id., 296.

In the present case, there was overwhelming evidence of the defendant's guilt independent of the statements he made in his home in response to DeSimone's question. At trial, Detective Nicholas Zabetta described his investigation of the crime scene and stated that there was clear evidence of a struggle that began in the kitchen. The condition of the body indicated to him that the victim had been struck with a blunt object and was stabbed multiple times while she was lying on the

floor by an assailant who was bending over and almost parallel to the victim. He also observed that there were several injuries to her neck, right cheek and chest, that a tooth was dislodged from her mouth and that her sweatshirt had been ripped with great force all the way to the waistline. The detective followed the trail of blood and bloody footprints in and out of the bathroom on the first floor, and he determined that the size of the footprints matched the defendant's foot size. The detective also observed a set of bloody footprints leading upstairs to the defendant's bedroom and found blood on the sheets and underside of a comforter. The defendant's T-shirts, stored in his closet, were the same style as the ones found blood soaked under the victim's body. The detective also used a blood enhancement agent that disclosed more defined areas of blood in the vicinity of the victim's body. This process also revealed attempts to clean or to alter the crime scene. The detective also testified that typically relatives or acquaintances of the victims, not strangers, will attempt to clean a murder scene. Finally, Zabetta's investigation revealed no sign of forced entry or any disturbance outside of the kitchen, and he noted that no valuables were missing from the home.

Grimaldi also testified. He stated that he noticed a bottle of carpet cleaner between the living room and the kitchen and blood around the sink area. As he inspected the victim, he noticed coagulated blood and dried blood in the outer region of the victim's ear. He stated that he found this to be unusual, as, from his experience, he knew that it takes longer than fifteen to twenty minutes for blood to congeal. To Grimaldi, this finding was noteworthy because the defendant had said that when he heard the "thud," he came down and almost immediately called the police.

Ira Kanfer of the state medical examiner's office concluded, on the basis of the blunt force trauma to her

face, that the victim had been struck twice by an object and that the blows were hard enough to knock her unconscious. The square shaped blunt force wounds to the victim were consistent with the shape of the candlestick holder found on the floor. He determined that the victim's death occurred within two minutes of the blows from a sharp instrument, most likely from the knife that was found on the floor next to her head. The medical examiner determined that she had been stabbed while on her back and that the weapon had cut the victim's esophagus, trachea, and carotid and subclavian arteries. The victim also had stab wounds to the neck, face and area above the right breast. Blood samples from the scene were analyzed by the state forensic laboratory, and the DNA found on defendant's underwear, college ring, watch, legs, bedsheets and comforter and on the knife and the first floor bathroom counter were consistent with the victim's DNA.

Finally, because of the location and number of wounds, the victim's death was classified as a homicide rather than a suicide. Kanfer stated that the injuries were not consistent with a suicide because instead of one or two strikes, with perhaps a hesitation strike more typical of a suicide, the victim's wounds were distributed all over the victim's body. In addition, the medical examiner stated that the evidence of blunt trauma to the left side of the victim's face was inconsistent with the notion that her wounds were self-inflicted.

In addition to the strength of this evidence, the admission into evidence of the defendant's statements to DeSimone were harmless because he made substantially similar statements in his 911 call, to Hayes at the scene and to his daughter after his arrest. All of these statements were admitted without objection. Thus, the defendant's statements to DeSimone were merely cumulative. See *State* v. *Pugh*, 45 Conn. App. 261, 267, 696 A.2d 354 (court concluded admission of challenged

statements harmless error because "the defendant's statements were merely cumulative of other testimony"), cert. denied, 242 Conn. 910, 697 A.2d 368 (1997).

There was no question concerning the admissibility of the 911 call, which the jury heard and which, in substance, conveyed the same information as the challenged statements. In his 911 call, the defendant stated that his wife was dead, that she had slashed her throat and that he had been upstairs and did not know what had happened. He made a similar statement to Hayes unprovoked by any questioning from Hayes when Hayes asked him to accompany him to the police station. Thus, similar to the statement made to the 911 dispatcher, the statement to Hayes was spontaneous and voluntary, and it was not challenged at trial. Last, Beata Zubrowski, the defendant's daughter, testified that on the day after the murder, the defendant telephoned her and asked her to come to his condominium because, as he explained, "[The victim] went crazy, there are cops all over here, [the victim] is dead. She must have killed herself because I went downstairs in my underwear at 2 a.m., and there was blood everywhere." Again, this statement was admitted without challenge at trial. Thus, even if the statements made by the defendant to DeSimone were the product of a custodial interrogation, their admission into evidence was harmless beyond a reasonable doubt because substantially similar statements made by the defendant to the 911 dispatcher, to Hayes and to the defendant's daughter were admitted without objection and because the evidence of the defendant's culpability, apart from his statement to DeSimone, was exceedingly strong.

## II

Next, the defendant claims that the court improperly charged the jury on intoxication. Specifically, the defendant argues that the court improperly denied his request

to instruct the jury that the prescription medication he was taking,[4] may have, by itself, rendered him intoxicated and incapable of forming the specific intent to kill. We are unpersuaded.

Following the close of evidence and after the defendant had submitted a request to charge on intoxication, the court instructed the jury as follows: "Now, there's one other matter bearing upon the question of whether the accused had the specific intent to kill required for a conviction of murder. There has been some testimony to the effect that [the defendant] was under the influence of an intoxicant, namely, alcohol, at the time of the alleged acts which caused the death of [the victim]. . . . If you find that the accused was under the influence of an intoxicant at the time of the alleged acts, you must then determine what effect, if any, this voluntary intoxication had on his ability to form the specific intent required to commit . . . murder . . . . Note that intoxication is not a defense to or an excuse for the commission of a crime. It is only relevant to negate an element of the crime charged such as the intent to kill required here for a conviction of murder." The defendant, however, took exception and asked the court to recharge the jury, and specifically requested that the court include in its instructions that "the mere taking of medication is sufficient to establish the intoxication defense . . . ."

In response to the defendant's request, the court stated: "I thought the doctor's—I thought the only evidence—well, not the only evidence—but I thought the

---

[4] The defendant's treating physician testified that the defendant was taking a number of prescription medications, including Xanax, Percocet and Ambien, which, without the use of alcohol, can have a strong sedative effect impairing one's physical and mental faculties. David Krulee, the forensic psychiatrist who evaluated the defendant, testified that both Xanax and Ambien can have a sedative effect similar to alcohol and will have a greater synergistic effect when combined with alcohol.

principal evidence from Dr. [David Krulee, the forensic psychiatrist who evaluated the defendant] was that he was intoxicated as a result of alcohol, the effects of which had been exacerbated by the medication. I didn't understand the testimony to be that he was under the influence of medication." The court then reviewed its notes and stated that the testimony of Krulee was that the prescription medications can produce a sedative effect like alcohol and can increase the effects of alcohol and make the defendant more intoxicated than usual. The court also pointed out to counsel that although there was testimony that the defendant was taking prescription medication, "[t]here's no evidence that he was taking it that day or while he was drinking. . . . [And] I don't find any evidence and I don't recall any and I don't see any in my notes in which anybody, including Dr. Krulee, opined that the intoxication was as a result of taking medication. I think the intoxication, if it existed, was as a result of drinking alcohol, the effects of which the doctor felt could have been exacerbated by the medications that he was taking. So, I'm willing, if you want me to, I'm willing to make reference to, you know, where I talk about testimony, to the effect, I'm willing to expand that into some reference to medications he was taking, but I don't think . . . there's any testimony [that] he could have been intoxicated from those medications [alone]."

Subsequently, the court further instructed the jury as follows: "Just one clarification of something I mentioned to you in the charge, and I would just want to call your attention to that part of the charge that dealt with intoxication. That matter bears on the question of whether the accused had the specific intent to kill required for a conviction of the crime of murder. And what I said to you then is [that] there has been some testimony to the effect that he was under the influence of an intoxicant, namely, alcohol at the time of the

alleged acts which caused the death of Zenobia Zubrowski.

"And what I want to add to that is that there was also some testimony that the intoxicating effects of the alcohol may have been increased as a result of certain prescription medication prescribed for the defendant, which I did not mention in my previous instruction to you. That's the only clarification that I consider needs to be made to you."

The defendant argues that the court's supplemental instruction was improper because it did not state specifically that prescription medication alone could have had an intoxicating effect on him that could have negated the specific intent to kill. We are unpersuaded.

Our analysis begins with a well established standard of review. "When reviewing the challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) State v. Leroy, 232 Conn. 1, 8, 653 A.2d 161 (1995).

Our review of the record reveals that the instructions were consistent with the trial evidence and that the instructions permitted the jury to consider the effects of both alcohol and prescription medication on the defendant's ability to formulate the specific intent to kill. After the defendant's exception to the charge, the

court reviewed its notes and commented to counsel that the defendant's expert, Krulee, had not focused on the effects of the prescription medication alone but, rather, had given testimony regarding the effects of a combination of alcohol with medication. In fact, the court observed, there had been considerable evidence concerning the defendant's chronic alcohol consumption, including the amount he had consumed on the night in question. A review of the record supports the court's conclusion that, in his testimony, Krulee did not consider the possibility that the defendant had taken only medication that night. Thus, the evidence adduced at trial does not support the defendant's claim of entitlement to a charge focused separately on the effects of medication. Accordingly, the jury charge fairly presented the case to the jury, providing it with sufficient guidance to reach a verdict.

## III

The defendant's final claim is that the court abused its discretion by permitting the state to introduce prior uncharged misconduct evidence through Beata Zubrowski. Acknowledging that the evidence was relevant, the defendant's sole argument on this issue is that the prejudicial impact of this evidence outweighed its probative value. We disagree and conclude that the evidence was probative and not unduly prejudicial and, thus, admissible pursuant to § 4-5 (b) of the Connecticut Code of Evidence and pertinent case law on the issues of intent and motive.[5]

The following additional facts and procedural history are relevant. On the first day of trial, and outside the

[5] Connecticut Code of Evidence § 4-5 (b) provides: "Evidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a), such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony."

jury's presence, the state indicated its intention to elicit testimony from Beata Zubrowski regarding several incidents of abusive conduct involving the defendant and the victim. The defendant objected, arguing that it was propensity evidence and that it was more prejudicial than probative. The court ruled that the evidence was relevant for the purpose of showing intent, identity and motive and that the probative value of this evidence outweighed its prejudicial effect. The court also stated that it would give the jury a cautionary instruction both before Beata Zubrowski testified and in its final instructions.

Subsequently, when Beata Zubrowski testified, she described a specific incident at a picnic in which the defendant "spoke in a very commanding voice, and if [the victim] didn't listen, he would pull on her or push her or either any portion he could grab, arm, hair, whatever." She further testified that at this picnic, she witnessed the defendant pull the victim's hair "four or five times" hard enough to cause her to fall. Moreover, she stated that this had not been an isolated incident and that the defendant treated the victim "with disrespect" and was verbally abusive to her "most of the time" and had been physically abusive to the victim on a number of other occasions. The following day, before the jury heard additional testimony, the court gave an extensive limiting instruction, admonishing the jury that it could use the testimony of the defendant's past behavior only as to the identity of the perpetrator, intent and motive.[6]

---

[6] The court instructed the jury as follows: "There are also some specific limitations to the kind of testimony that . . . [Beata Zubrowski] gave you yesterday. There were some things you may use her testimony for, and there are some things you may not use her testimony for.

"Let me start with what you may not use it for. You may not use it to decide that [the defendant] is a bad person, and, therefore, he must have committed this crime. You may not use it to determine that [the defendant] because he committed violence toward [the victim] on an earlier occasion, if you believe that testimony, that he must have committed violence on her on this occasion, which the state charges. You may not use that testimony for that purpose."

"A trial court's ruling on the admissibility of evidence is entitled to great deference and will be overturned only if a clear abuse of the court's discretion is shown and the defendant shows that the ruling caused substantial prejudice or injustice. An appellate tribunal is required to make every reasonable presumption in favor of upholding the trial court's ruling." (Internal quotation marks omitted.) State v. Thomas, 96 Conn. App. 578, 583–84, 901 A.2d 76, cert. denied, 280 Conn. 912, 908 A.2d 542 (2006). Thus, the standard we employ to review this claim is whether the court abused its discretion in allowing this evidence of prior misconduct.

"[A]s a general rule, evidence of prior misconduct is inadmissible to prove that a defendant is guilty of the crime of which he is accused. . . . We have recognized exceptions to this general rule, however. Evidence of prior misconduct may be admissible . . . for other purposes, such as to prove knowledge, intent, motive, and common scheme or design . . . . Accordingly, [our Supreme Court has] established a two-pronged test for determining the admissibility of prior misconduct evidence. Such evidence is admissible if: (1) it is relevant and material to at least one of the circumstances encompassed by the exceptions; and (2) its probative value outweighs its prejudicial effect." (Citations omitted; internal quotation marks omitted.) State v. James G., 268 Conn. 382, 390, 844 A.2d 810 (2004). Because the defendant concedes[7] that the evidence of misconduct was relevant and material, we need only address whether the evidence was unduly prejudicial to him.

"[E]vidence may be excluded by the trial court if the court determines that the prejudicial effect of the evidence outweighs its probative value. . . . Of

---

[7] In his brief, the defendant states: "The defendant does not dispute that his daughter's testimony may have had some marginal relevance on the issues of his intent and motive. However, the great prejudicial impact of her testimony outweighs its minimal probative value."

course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury. . . . The court bears the primary responsibility for conducting the balancing test to determine whether the probative value outweighs the prejudicial impact, and its conclusion will be disturbed only for a manifest abuse of discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *DeJesus*, 91 Conn. App. 47, 64, 880 A.2d 910 (2005), cert. granted on other grounds, 279 Conn. 912, 903 A.2d 658 (2006).

As previously stated, the admitted evidence of prior misconduct was relevant to the issues of intent and motive,[8] both key components of the state's case. The defendant contends, nevertheless, that this prior misconduct evidence unnecessarily aroused the jurors' emotions and hostility against him, and, thus, its prejudicial effect greatly outweighed its probative value.

Although some prejudice may flow naturally from prior misconduct evidence, the evidence offered in this instance was not of the sort that would shock the jury or inflame its passions, given the nature and extent of the crime scene evidence. "We previously have held that evidence of dissimilar acts is less likely to be prejudicial than evidence of similar or identical acts." (Internal quotation marks omitted.) *State* v. *Vega*, 259 Conn. 374, 398, 788 A.2d 1221, cert. denied, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002). Here, the evidentiary substantiation of the vicious conduct, with which the defendant was charged, far outweighed, in severity, the character of his prior misconduct. As noted, the prior misconduct at issue included instances of physical and verbal abuse against the victim; however, none of these

---

[8] Identity was admitted by the defendant in closing argument.

assaults compared in scope with the brutality of the incident that took place on January 1, 2002, causing the victim's death.

Moreover, the court minimized the potential prejudice to the defendant of the prior misconduct evidence by giving the jury detailed limiting instructions as to the role the evidence was to play in its deliberations, and the court repeated its admonition to the jury in its final instructions. "Proper limiting instructions often mitigate the prejudicial impact of evidence of prior misconduct." (Internal quotation marks omitted.) *State* v. *Orellana*, 89 Conn. App. 71, 89, 872 A.2d 506, cert. denied, 274 Conn. 910, 876 A.2d 1202 (2005). Furthermore, absent clear evidence to the contrary, a jury is presumed to have followed a court's limiting instructions, which serve to lessen any prejudice resulting from the admission of such evidence. See *State* v. *James G.*, supra, 268 Conn. 397–98.

We conclude that the court carefully and properly balanced the probative value of the evidence of the defendant's prior abusive conduct toward the victim with its potential prejudicial impact. "The care with which the court weighed the evidence and devised measures for reducing its prejudicial effect militates against a finding of abuse of discretion." *State* v. *Erhardt*, 90 Conn. App. 853, 862, 879 A.2d 561, cert. denied, 276 Conn. 906, 884 A.2d 1028 (2005). In this instance, having properly balanced the probative value of the prior misconduct evidence with its potentially prejudicial impact, and having carefully instructed the jury regarding this evidence, the court did not abuse its discretion in allowing the jury to hear testimony regarding the defendant's prior misconduct directed toward the victim.

The judgment is affirmed.

In this opinion the other judges concurred.