### STATE OF CONNECTICUT *v.* COREY CHRISTOPHER MCCLELLAND
### (AC 28268)

Flynn, C. J., and DiPentima and Mihalakos, Js.

Argued October 27, 2008—officially released March 17, 2009

*Katherine C. Essington*, special public defender, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *Patricia M. Froehlich*, state's attorney, and *Matthew A. Crockett*, assistant state's attorney, for the appellee (state).

DiPENTIMA, J. On March 9, 2006, the state filed an amended long form information charging the defendant, Corey Christopher McClelland, with crimes relating to the death of his two month old son. Specifically, the state charged the defendant with one count of assault in the first degree under circumstances evincing an extreme indifference to human life in violation of General Statutes § 53a-59 (a) (3), three counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (1) and one count of manslaughter in the first degree in violation of General Statutes § 53a-55. Following a jury trial, the defendant was convicted of all charges with the exception of one count of risk of injury to a child. On appeal, the defendant claims that the trial court improperly (1) admitted evidence of his prior misconduct, (2) denied his motion to strike testimony concerning his prior misconduct and (3) found that he was not entitled to an in camera review of records from the department of children and families (department). We disagree, and accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In September, 2001, the defendant and his wife, M, lived with their two sons, K and the victim. At the time, K was approximately three and a half years old and the victim was approximately two months old. The victim was an overall healthy baby but cried frequently. Following M's maternity leave, she returned to work full-time while the defendant was unemployed. Four days a week both children were in the care of Paula Mayo, a day care provider. The defendant cared for the children during the remaining weekday. Although M and the defendant were happy with Mayo's care, they decided that beginning on September 17, 2001, the defendant would care for the children three days a week to save money.

The defendant was at home with the children on September 17, 2001, the first day of the new day care schedule. At approximately 10:30 a.m., the defendant called M at work and told her that the victim was crying. He stated that he was not sure what was wrong with the victim and asked if M would be coming home from work during lunch. M responded that she was not coming home from work during lunch but suggested that the victim might be hungry, as he had not eaten since 6 o'clock that morning.

The defendant called again at 1:30 p.m. and told M that the victim was not breathing. He explained that he had put the victim to bed earlier and discovered that the victim was not breathing when he went to wake him up. When M asked if the victim still was not breathing, the defendant responded that the victim was not and that the victim felt cold. M stated she would be home right away and hung up. She began to drive home but turned around and went back to work because she was unable to recall if the defendant had called 911. She called the defendant, who stated that he had not called 911, and she yelled at him to do so.

The police received a 911 call from the defendant at 1:39 p.m. The defendant calmly stated that his son was not breathing. In response to the call, Officer Louis Cinque drove to the defendant's home. The defendant answered the door while holding the victim and told Cinque that the victim was not breathing and was cold. The defendant handed the victim to Cinque, who placed the victim on the floor and observed that the victim did not have a pulse and was not breathing. The defendant stated that he had bruised the victim when he had attempted cardiopulmonary resuscitation, and Cinque noticed some bruising near the victim's rib cage, chest and abdomen. Emergency personnel arrived and took control of treating the victim. Despite their efforts, the victim remained unresponsive and exhibited no signs

of life. He was taken to a hospital by ambulance where he was pronounced dead.

Later that evening, the police interviewed M at her home and the defendant at police headquarters. The next day, September 18, 2001, the police again interviewed the defendant and M separately. Earlier that day, the police had learned from the victim's autopsy that he had died from suffocation and that his bones, which had been broken and rebroken, were in various stages of healing. The police asked the defendant about those injuries, and the defendant responded that he was a big man and had been "heavy handed" with the victim. He stated that the bones could have broken when he was feeding or burping the victim. The defendant stated that neither Mayo nor M would ever hurt the victim.

Harold Wayne Carver II, a forensic pathologist and the state's chief medical examiner, testified regarding the autopsy of the victim. He stated that the cause of death was asphyxia with multiple healing blunt trauma injuries, which he explained meant that the victim's oxygen supply had been cut off by physical means and that the victim had multiple injuries to his ribs and bones in various stages of healing.[1] He testified that the victim's injuries were not consistent with resuscitation efforts but were consistent with inflicted injuries.

The state called Eli Newberger, a physician, who testified as an expert in pediatrics. Newberger opined that on the basis of his review of the medical records, photographs and interview transcripts, the victim was suffocated when an adult hand obstructed the victim's

[1] Dean Uphoff, a pathologist, examined the victim's brain as part of the autopsy. He testified that his examination revealed that the victim's brain was deprived of oxygen shortly before death. The state also called Christopher Foley, a pediatric radiologist, who testified as an expert in radiology. He stated that the victim's injuries were not attributable to birthing, resuscitation efforts or picking up the victim from under the arms or around the rib cage and opined that the injuries were consistent with child abuse.

airway. He testified that the bruises around the mouth and nose occurred within close proximity to the victim's death and were not the result of resuscitation efforts.[2]

The police interviewed the defendant again in September, 2002, but did not seek an arrest warrant until September 5, 2003. The defendant pleaded not guilty to all charges, and a jury trial commenced on April 18, 2006. On May 2, 2006, the jury found the defendant guilty of count one, assault in the first degree under circumstances evincing an extreme indifference to human life in violation of § 53a-59 (a) (3), counts two and four, risk of injury to a child in violation of § 53-21 (a) (1) and count five, manslaughter in the first degree in violation of § 53a-55.[3] On July 11, 2006, the defendant was sentenced to ten years incarceration on count one. He was also sentenced to ten years incarceration on count two and ten years incarceration on count four, both to run concurrently with count one. On count five, the defendant was sentenced to twenty years incarceration, execution suspended after fifteen years, with five years probation, to run consecutively to count one. Thus, the defendant received a total effective sentence of thirty years incarceration, execution suspended after fifteen years, and five years probation with the condition of no contact with children younger than age sixteen. Additional facts will be set forth as necessary.

I

The defendant first claims that the court improperly admitted evidence of his prior misconduct. Specifically, the defendant argues that the court abused its discretion by admitting evidence of an incident in which he harmed

---

[2] Newberger also testified that he observed multiple rib and bone fractures in various stages of healing, which he stated evidenced a "truly chronic process of injuring [the] child." He opined that the victim would have been in significant pain from these injuries and would have cried often.

[3] The defendant was found not guilty of count three, risk of injury to a child in violation of General Statutes § 53-21 (a) (1).

his older son, K, because the incident was not material to the issue of whether the defendant intentionally harmed the victim. The defendant further argues that the prejudicial nature of the evidence outweighed its limited probative value.

Additional facts inform our resolution of the defendant's claim. Prior to trial, the state filed a notice of intent to introduce evidence of other crimes, wrongs or acts. In response, the defendant filed a motion in limine to preclude testimony of his prior bad acts. At trial, following a voir dire examination of M and argument by counsel, the court overruled the defendant's objection to the admission of the prior uncharged misconduct evidence. The court concluded that the evidence was not unduly prejudicial and was relevant and probative as to the issue of intent. The court rejected the defendant's argument that the location of an injury to K's penis, made the evidence unduly prejudicial. The court overruled the defendant's renewed objection and allowed M to testify about the following incident. She stated that in 1998 while they were living in another state, the defendant was watching K while she was at work. K was ten months old at the time. The defendant called M at work and told her that he had injured K. He explained that he had been changing K's diaper when K began touching his penis. The defendant did not believe this was appropriate behavior and pulled K's hand away. When K reached for his penis again, the defendant swatted K's hand away, hitting K's hand as well as his penis. The defendant told M that K's penis was a little swollen, but when M returned home she discovered that K's penis and groin area were extremely swollen. She also noticed that there was a cut on K's penis and blood on the diaper. After M took K to the hospital, child protective services insisted that the defendant leave the house but eventually allowed him to return. M also testified that this incident caused her

to be concerned about the defendant's interactions with the victim. During his testimony, the defendant testified that he had mistakenly believed that it was inappropriate for K to touch his penis but has since learned that it is normal for babies to touch themselves. He explained that he swatted away K's hand twice but accidentally hit his penis the second time.

The court, prior to constructing a limiting instruction regarding the prior misconduct evidence, stated: "[I]t's my understanding that the state has offered the prior misconduct with respect to the element of intent; is that correct?" The state responded that it cited intent, malice and common plan in its brief on the issue but that intent was the strongest basis for admission of the evidence. The court responded that it would give the instruction on the element of intent. The defendant did not object.

Two days after M's testimony regarding the injury to K, the court read its limiting instruction to counsel. Both the state and the defendant had no objection to the instruction. Addressing the jury later that day, the court stated: "[I]n particular, I want to draw your attention to the evidence initially testified to by [M] and then mentioned also in the tape where [an officer] was interviewing [the defendant]. And that is reference to an issue which took place in [another state] with . . . the party's older child." The court explained that this evidence is referred to as a prior act of misconduct and may only be considered in a limited way. The court then instructed the jury that "[t]he evidence offered by the state of prior acts of misconduct of the defendant is not being admitted to prove the bad character of the defendant or the defendant's tendency to commit criminal acts. Such evidence is being admitted solely to show or establish the existence of intent, which is a necessary element of some of the crimes charged. You may not consider such evidence as establishing a

predisposition on the part of the defendant to commit any of the crimes charged or to demonstrate a criminal propensity. You may consider such evidence if you believe it and further find that [it] logically, rationally and conclusively supports the issue for which it is being offered by the state, but only as it may bear here on the issue of intent."[4] The court repeated this limiting instruction in its final charge to the jury.[5]

Our standard of review for this issue is well established. "The admission of evidence of prior uncharged misconduct is a decision properly within the discretion of the trial court. . . . [E]very reasonable presumption should be given in favor of the trial court's ruling. . . .

---

[4] The court further explained: "[T]his is call[ed] a limiting instruction, and it's kind of a self-defining term, if you will. It instructs you that the evidence can only be used for a limited purpose, and the purpose is essentially to show—the state would offer that it shows intent."

[5] Specifically, the court stated: "There was evidence offered and admitted by the state of prior misconduct of the defendant. And when I give this instruction, I refer specifically to the incidents that were alleged to have happened in [another state] some time prior to the defendant's residence in the state of Connecticut.

"The evidence offered by the state of prior acts of misconduct of the defendant is not being admitted to prove the bad character of the defendant or the defendant's tendency to commit a criminal act. Such evidence is being admitted solely to show or establish the existence of intent, which is a necessary element of a crime charged.

"You may not consider such evidence as establishing a predisposition on the part of the defendant to commit any of the crimes charged or to demonstrate a criminal propensity. You may consider such evidence if you believe it and, further, find that [it] logically, rationally and conclusively supports the issue for which it is being offered by the state, but only as it may bear here on the issue of intent.

"On the other hand, if you do not believe such evidence or even if you do . . . if you find that it does not logically, rationally and conclusively support the issues for which it is being offered by the state, then you may not consider that testimony for any purpose.

"You may not consider evidence of prior misconduct for any reason other than those stated in these instructions because it may predispose your mind to believe that the defendant may be guilty of the offense charged here merely because of the prior misconduct. For this reason, you may consider this evidence only on the issue of intent and for no other purpose."

[T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Peloso*, 109 Conn. App. 477, 506–507, 952 A.2d 825 (2008).

There are familiar principles restricting the admissibility of evidence of uncharged prior misconduct. "As a general rule, evidence of prior misconduct is inadmissible to prove that a criminal defendant is guilty of the crime of which the defendant is accused. . . . Such evidence cannot be used to suggest that the defendant has a bad character or a propensity for criminal behavior." (Citation omitted; internal quotation marks omitted.) *State* v. *Aaron L.*, 272 Conn. 798, 820, 865 A.2d 1135 (2005); see Conn. Code Evid. § 4-5 (a). There are exceptions, however, to this general rule. "Evidence may be admissible . . . for other purposes, such as to prove knowledge, intent, motive, and common scheme or design, if the trial court determines, in the exercise of judicial discretion, that the probative value of the evidence outweighs its prejudicial tendency." (Internal quotation marks omitted.) *State* v. *George B.*, 258 Conn. 779, 790, 785 A.2d 573 (2001); see Conn. Code Evid. § 4-5 (b).

We use a two-pronged test to determine whether uncharged prior misconduct evidence is admissible. "First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect of the [prior misconduct] evidence." (Internal quotation marks omitted.) *State* v. *Nunes*, 260 Conn. 649, 685, 800 A.2d 1160 (2002). The first prong requires the trial court to determine if an exception applies to the evidence at issue. *State* v. *Kulmac*, 230 Conn. 43, 61, 644 A.2d 887 (1994). Here, the court admitted evidence of the injury to K on the issue of the defendant's intent with regard to the

victim. On appeal, the defendant argues that the evidence was not relevant or material to the issue of intent on the charges against him involving the victim's death. We disagree.

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative. . . . *State* v. *Prioleau*, 235 Conn. 274, 305, 664 A.2d 743 (1995)." (Internal quotation marks omitted.) *State* v. *Nunes*, supra, 260 Conn. 685–86.

The evidence of the injury to K was relevant to the issue of intent. With it, the jury reasonably could infer the defendant's intent with regard to the physical force used on his son, K. The jury reasonably could then use this evidence to determine the defendant's intent regarding his actions toward the victim. Such evidence was relevant when the defendant testified that he merely discovered that the victim was not breathing when he went to check on him and denied hurting the victim or having knowledge of what caused his death. Thus, the prior misconduct evidence was relevant to rebut the defendant's suggestion that the victim's death was caused by factors other than his intentional conduct. See *State* v. *Nunes*, supra, 260 Conn. 686–87 (evidence of prior incident in which defendant used substance to impair victim relevant where defendant

denied causing victim's symptoms of impairment); *State* v. *Orellana*, 89 Conn. App. 71, 87–88, 872 A.2d 506 (evidence of prior misconduct admissible to rebut defendant's contention he was unaware of heroin in vehicle), cert. denied, 274 Conn. 910, 876 A.2d 1202 (2005).

Having determined that the evidence was relevant to the issue of intent, we turn to the second prong, which provides that the prior misconduct evidence must be excluded if the prejudicial effect of the evidence outweighs its probative value. See *State* v. *Zubrowski*, 101 Conn. App. 379, 394–95, 921 A.2d 667 (2007), appeal dismissed, 289 Conn. 55, 956 A.2d 578 (2008), cert. denied, 555 U.S. 1216, 129 S. Ct. 1533, 173 L. Ed. 2d 663 (2009). "Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury." (Internal quotation marks omitted.) *State* v. *Smith*, 275 Conn. 205, 218, 881 A.2d 160 (2005).

Although the evidence of the injury to K was prejudicial to the defendant, its prejudicial effect did not outweigh its probative value. Evidence of dissimilar acts is less likely to be prejudicial than evidence of similar acts. *State* v. *Cator*, 256 Conn. 785, 800, 781 A.2d 285 (2001); *State* v. *Graham*, 200 Conn. 9, 12, 509 A.2d 493 (1986) ("[w]here the prior crime is quite similar to the offense being tried, a high degree of prejudice is created and a strong showing of probative value would be necessary to warrant admissibility" [internal quotation marks omitted]). Here, the injuries to the victim were significantly more severe in their force and brutality than the prior misconduct acts against K. The prior misconduct evidence, therefore, was not sufficiently similar to create undue prejudice and was not evidence likely to shock the jury or inflame its passions given the acts

alleged in the crimes at issue. See *State* v. *Zubrowski*, supra, 101 Conn. App. 395–96 (evidence of prior misconduct not unduly prejudicial or likely to inflame passions of jury when prior acts alleged were less brutal and severe than crime charged); *State* v. *Vega*, 259 Conn. 374, 398–99, 788 A.2d 1221 (evidence of prior assaults on victim admissible when such assaults not on par with unique brutality alleged in crime at issue), cert. denied, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002).

Moreover, the probative value of the prior misconduct evidence was significant. The nature of the case forced the state to rely on circumstantial evidence and other inferences of intent to meet its burden. See *State* v. *Tucker*, 181 Conn. 406, 416–17, 435 A.2d 986 (1980) (evidence of prior child abuse probative on issue of intent in child homicide); see also *State* v. *Smith*, 110 Conn. App. 70, 79, 954 A.2d 202 (intent generally inferred from conduct or proven by circumstantial evidence because direct evidence of defendant's state of mind rarely available), cert. denied, 289 Conn. 954, 961 A.2d 422 (2008). Particularly in the absence of direct evidence of intent, testimony regarding the injury to K was highly probative. In addition, the court twice issued a limiting instruction to the jury, which minimized the potential prejudice to the defendant.[6] See *State* v. *Orellana*, supra, 89 Conn. App. 89 ("[p]roper limiting instructions often mitigate the prejudicial impact of evidence

---

[6] To the extent that the defendant challenges the sufficiency of the limiting instruction, we decline to review his claim. Specifically, the defendant argues that the jury instruction was flawed because it failed to instruct the jury that the prior misconduct evidence was relevant only to the charges of risk of injury to a child. The defendant did not object to the jury instruction at trial and, thus, did not preserve this claim for appellate review. On appeal, the defendant failed to request review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), or the plain error doctrine. See Practice Book § 60-5. "Where a defendant fails to seek review of an unpreserved claim under either *Golding* or the plain error doctrine, this court will not examine such a claim." (Internal quotation marks omitted.) *State* v. *Parham*, 70 Conn. App. 223, 231 n.9, 797 A.2d 599 (2002). We note that this court

of prior misconduct" [internal quotation marks omitted]). Absent evidence to the contrary, a jury is presumed to have followed the court's instructions. *State v. Fields*, 265 Conn. 184, 207, 827 A.2d 690 (2003). Thus, we conclude that the court properly balanced the potential prejudicial impact of the testimony with its probative value and, having instructed the jury on the limited use of the evidence, did not abuse its discretion in admitting evidence of the defendant's prior uncharged misconduct.

## II

The defendant next claims that the court improperly denied his motion to strike testimony that violated the prohibition on using prior misconduct as evidence of a defendant's propensity to commit criminal acts. We disagree.

At trial, Newberger testified that he reviewed information regarding an incident in another state in which the defendant had injured K. Newberger stated that although he did not rely on the incident in forming his opinion as to the victim's injuries, it was "of significance because it showed a prior capacity to assault a young child." Defense counsel did not object immediately to this testimony.

Two days later, on April 28, 2006, the defendant filed a motion to strike and for a curative instruction regarding specific portions of Newberger's testimony. Defense counsel argued that Newberger's testimony regarding the injury to K, specifically remarks that were in response to questions on cross-examination, should be

has previously held that *Golding* review is not available for this claim. *State v. Rosario*, 99 Conn. App. 92, 105 n.8, 912 A.2d 1064 ("failure of the trial court to give a limiting instruction concerning the use of evidence of prior misconduct is not a matter of constitutional magnitude" [internal quotation marks omitted]), cert. denied, 281 Conn. 925, 918 A.2d 276 (2007). Accordingly, we decline to address the defendant's claim.

stricken through the court's supervisory authority. The court denied the motion, noting that it already had given an instruction relating to the evidence of prior misconduct and would repeat that instruction in its final charge to the jury. The court also stated that it was no longer the appropriate time for such a motion and that counsel could have made a motion to strike Newberger's testimony as unresponsive at the time it was given.

We first set forth our standard of review of a trial court's denial of a defendant's motion to strike. "[T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice." (Internal quotation marks omitted.) *State* v. *Thompson,* 266 Conn. 440, 454, 832 A.2d 626 (2003).

Here, the defendant's motion came two days after the testimony. In general, objections to the answer to a question should be made before the next question. C. Tait & E. Prescott, Connecticut Evidence (4th Ed. 2008) § 1.30.2, p. 79; see also *Zullo* v. *Zullo,* 138 Conn. 712, 716, 89 A.2d 216 (1952) (denial of motion to strike not abuse of discretion when motion untimely). Moreover, the court issued a limiting instruction regarding evidence of prior misconduct, specifically, the injury to K to which Newberger referred, during trial and again as part of the final instructions. As our Supreme Court has stated repeatedly, "[t]he jury [is] presumed to follow the court's directions in the absence of a clear indication to the contrary." (Internal quotation marks omitted.) *State* v. *Flowers,* 278 Conn. 533, 547, 898 A.2d 789 (2006).

Given the untimely nature of the motion and the court's multiple limiting instructions on the very subject of the testimony at issue, we cannot conclude that the court's denial of the motion to strike was an abuse of discretion.

## III

Finally, the defendant claims that the court improperly found that he was not entitled to an in camera review of records from the department. Specifically, the defendant argues that by declining to conduct an in camera review of the records, the court violated his sixth amendment right to confrontation as well as his fourteenth amendment right to due process.[7] We disagree.

On September 18, 2001, the day after the victim's death, representatives from the department removed K from his parents' care and placed him in a foster home. K was sent subsequently to live with M's parents in another state. M and the defendant separated in January, 2002, and eventually divorced. M moved to another state in September, 2002, and, in September, 2003, K resumed living with her. The defendant was arrested on September 5, 2003.

Prior to trial, the defendant filed a motion for discovery that included a request for the department's records relating to K. At the hearing on the motion during trial,

[7] The defendant also argues that the court improperly failed to inquire of the prosecutor whether consent had been given to release the department records. The defendant asserts that the court was required to make this inquiry before turning to the issue of whether he had made the showing necessary to overcome lack of consent. The defendant did not make this argument at trial and does not request plain error review on appeal. See Practice Book § 60-5 (court not bound to consider claim unless raised at trial but may notice plain error not brought to attention of trial court). Thus, we decline to review the claim because it was not raised at trial or properly preserved for appeal. See *State* v. *Klinger*, 103 Conn. App. 163, 168–69, 927 A.2d 373 (2007) (inappropriate to engage in level of review, such as plain error, when not requested).

the defendant argued that the department's records should be provided to the defense or, in the alternative, that the court should conduct an in camera review of the records. Defense counsel stated: "We've asked through our discovery process . . . for exculpatory information with regard to my client. Exculpatory information includes the information that can be used to impeach for interest, prejudice and bias. We have been informed by the state's attorney, and we accept her representation in good faith, that the information provided to her from [the department] includes no exculpatory information with regard to [the defendant], and, obviously, since we don't have it, we'd have to take it at their word." Defense counsel claimed that the department "routinely tells parents that they must cooperate with [the department] to get their children back" and that because M was reunited with K just before the defendant's arrest, there was a "reasonable inference that the [department] told [M] that she could get [K] back if she testified." Specifically, defense counsel argued that the records contained evidence of this agreement, which could be used "for confrontational purposes, for impeachment purposes," and, therefore, the defendant was entitled to the records under the sixth amendment's confrontation clause and the fourteenth amendment's due process clause.

The court denied the defendant's motion, noting that it was not aware of any authorization or permission granted by the appropriate parties to release the records and that in the absence of such authorization, the defendant was required to make a showing, under *State* v. *Kulmac*, supra, 230 Conn. 43, for the court to undertake an in camera review of the materials. The court concluded that the defendant had not made the requisite showing and that "a suspicion that there might be something exculpatory in the records" is insufficient. The court noted that both M and the department worker

testified and that the defendant had the opportunity to cross-examine both witnesses.

The defendant argues that the sixth amendment's confrontation clause provides a right to have the court conduct an in camera review of confidential records. He claims that the court's failure to do so resulted in the denial of his sixth amendment right to effectively cross-examine M regarding her motive for testifying. He maintains that defense counsel's assertion at trial that the records might contain information that the department told M she could "get her child back" if she testified constituted a preliminary showing sufficient to overcome the confidentiality of the records, and, thus, the court abused its discretion when it did not conduct an in camera review. We disagree with the defendant.

This court will review a trial court's denial of a defendant's request to conduct an in camera review of confidential records pursuant to our standard of review for evidentiary rulings. *State* v. *Betances*, 265 Conn. 493, 506, 828 A.2d 1248 (2003). Therefore, "[w]e review a court's conclusion that a defendant has failed to make a threshold showing of entitlement to an in camera review of statutorily protected records . . . under the abuse of discretion standard. . . . We must make every reasonable presumption in favor of the trial court's action. . . . The trial court's exercise of its discretion will be reversed only where the abuse of discretion is manifest or where injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *George J.*, 280 Conn. 551, 599–600, 910 A.2d 931 (2006), cert. denied, 549 U.S. 1326, 127 S. Ct. 1919, 167 L. Ed. 2d 573 (2007).

General Statutes § 17a-28 (b) provides that department records are privileged and may not be released

without the consent of the person involved or that person's authorized representative. A defendant's sixth amendment right to confrontation, however, prevents department records from being privileged unconditionally. *State* v. *Januszewski*, 182 Conn. 142, 170–71, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981). "It is well established that [a] criminal defendant has a constitutional right to cross-examine the state's witnesses, which may include impeaching or discrediting them by attempting to reveal to the jury the witnesses' biases, prejudices or ulterior motives, or facts bearing on the witnesses' reliability, credibility, or sense of perception." (Internal quotation marks omitted.) *State* v. *Peeler*, 271 Conn. 338, 379, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005); see *State* v. *Slimskey*, 257 Conn. 842, 853, 779 A.2d 723 (2001). "We are mindful, however, that the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." (Internal quotation marks omitted.) *State* v. *Rolon*, 257 Conn. 156, 175, 777 A.2d 604 (2001).

In light of these competing interests, our Supreme Court has established that to compel an in camera review of confidential records, a defendant must make a preliminary showing that there is a reasonable ground to believe that failure to review the records likely would impair the defendant's right to confrontation. *State* v. *Kulmac*, supra, 230 Conn. 58–59. To meet this burden, the defendant must do more than assert that the privileged records may contain information that would be useful for the purposes of impeaching a witness' credibility. Id., 56–57; accord *State* v. *Colon*, 272 Conn. 106, 264–65, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005). As explained by our Supreme Court: "[T]he defendant's offer of proof should be specific and should set forth the issue in the

case to which the [confidential] information sought will relate." (Internal quotation marks omitted.) *State* v. *George J.*, supra, 280 Conn. 599.

Here, defense counsel simply asserted that the department "routinely tells parents that they must cooperate with [the department] to get their children back." He concluded that because M was reunited with K, "just before" the defendant's arrest, it was reasonable to infer that she was told that she must testify against the defendant to be allowed to live with K. The defendant did not provide any support for this assertion or offer any indication that the department records would contain evidence of this arrangement, but merely argued that the records may contain information that would be useful for impeachment purposes. This simply was insufficient under our case law. See *State* v. *Kulmac*, supra, 230 Conn. 56–57. We cannot conclude, therefore, that the court abused its discretion in concluding that the defendant had not made a sufficient showing to compel an in camera inspection of the records.

Moreover, the record indicates that defense counsel was afforded an opportunity to cross-examine both M and the representative from the department. Defense counsel conducted an extensive cross-examination of M and, although given the opportunity to do so, declined to cross-examine the representative from the department. "[T]he confrontation clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Slimskey*, supra, 257 Conn. 854. We note, as did the trial court, that defense counsel could have used these opportunities for cross-examination to question the witnesses as to any arrangement between M and the department. Such an examination could have established a showing sufficient to compel an in camera review. Although defense counsel did question M regarding

whether she had made any deals of cooperation with the police or the prosecution, when she responded that she had not, he did not inquire further. Significantly, the court did not limit defense counsel's questions on cross-examination. Thus, we conclude that the court did not impair the defendant's right to confrontation when it declined to conduct an in camera review of the department records. See *State* v. *Gonzalez*, 75 Conn. App. 364, 384, 815 A.2d 1261 (2003) (court's denial of motion to conduct in camera review did not infringe on defendant's confrontation rights where defendant afforded wide latitude in cross-examination of witnesses), rev'd on other grounds, 272 Conn. 515, 864 A.2d 847 (2005).

Through our review of the record, specifically, defense counsel's colloquy on this issue at trial, it appears that the defendant argued for an in camera review of the department records solely on the basis of his sixth amendment right to confrontation. To the extent that the defendant has preserved any due process claim, which relates to the right to exculpatory evidence, we consider that claim here.

On appeal, the defendant also argues that he had a right to an in camera review of the department records under the due process clause of the fourteenth amendment. He maintains that he made a showing sufficient to compel an in camera review pursuant to the standard set forth in *State* v. *Leduc*, 40 Conn. App. 233, 670 A.2d 1309 (1996), on appeal after remand, 44 Conn. App. 744, 690 A.2d 1390, cert. denied, 241 Conn. 909, 695 A.2d 541 (1997). We disagree.

In *Pennsylvania* v. *Ritchie*, 480 U.S. 39, 58, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987), the United States Supreme Court held that the fourteenth amendment's due process clause provides a right to exculpatory information contained in confidential materials. This court,

in *State* v. *Leduc*, supra, 40 Conn. App. 233, established that to compel an in camera review under the due process clause, the defendant "must at least make some plausible statement of how the information would be both material and favorable to his defense." Id., 248. The court went on to explain that "[f]avorable evidence is that evidence which . . . might have led the jury to entertain a reasonable doubt about . . . guilt . . . and this doubt must be one that did not otherwise exist. . . . On the other hand, evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *United States* v. *Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985); *State* v. *Rasmussen*, [225 Conn. 55, 92, 621 A.2d 728 (1993)]; *State* v. *Pollitt*, 205 Conn. 132, 142–43, 531 A.2d 125 (1987)." (Internal quotation marks omitted.) *State* v. *Leduc*, supra, 249–50.

In *Ritchie*, the defendant was charged with the rape and sexual assault of his thirteen year old daughter. *Pennsylvania* v. *Ritchie*, supra, 480 U.S. 43. The victim reported the incidents to the police, who, in turn, contacted the state children and youth services agency (agency). Id. The defendant argued that he was entitled to the agency file because it "might contain the names of favorable witnesses, as well as other, unspecified exculpatory evidence." Id., 44. Analyzing the defendant's due process rights rather than his constitutional confrontation claim, the Supreme Court concluded that the defendant was "entitled to have the [agency] file reviewed by the trial court to determine whether it contains information that probably would have changed the outcome of [the] trial." Id., 58.

Similarly, in *Leduc*, the defendant was charged with sexually assaulting his four year old daughter. *State* v. *Leduc*, supra, 40 Conn. App. 234–35. The victim

described her abuse to her mother, who took her to a counselor at a private counseling agency. Id., 236. The victim disclosed the incidents to the counselor, who reported the case to the department. Id. The department investigated the allegations and subsequently closed its file. Id. The department later opened its investigation after the counselor, concerned that the initial investigation had been inadequate, again reported the case to the department. Id. The department again closed its file. Id., 248.[8] In his request for the department file, the defendant had stated that it "may contain exculpatory information because after speaking to the victim, [the department] closed the file and did not pursue the charges." Id. This court, noting that the department twice closed its file after investigating the victim's allegations of abuse, concluded that the defendant had made a showing sufficient to compel an in camera review of the department records. Id.

The defendant's argument at trial in the present case compels a conclusion different from that in *Ritchie* and *Leduc*. Here, the defendant simply asserted his belief that the department had compelled M to testify against him and that the files might contain information to this effect, which he could use to impeach M. He did not argue, as did the defendants in *Ritchie* and *Leduc*, that the department records would reveal information that would address the defendant's culpability or otherwise tend to exculpate him. Although we recognize that "the obligation to disclose exculpatory material does not depend on the presence of a specific request"; id.; the defendant's argument essentially constituted "a suspicion that there might be something exculpatory in the records." See *State* v. *Berube*, 256 Conn. 742, 758, 775 A.2d 966 (2001) ("[t]he defendant, of course, may not

---

[8] The defendant in *Leduc* was arrested only after the victim's mother reported the abuse to the police. See *State* v. *Leduc*, supra, 40 Conn. App. 236.

require the trial court to search through the [department] file without first establishing a basis for his claim that it contains material evidence" [internal quotation marks omitted]). Accordingly, we cannot conclude that the court abused its discretion in determining that the defendant had not met his burden of showing that an in camera review would have revealed information material and favorable to his defense.

The judgment is affirmed.

In this opinion the other judges concurred.